# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES H. BANKSTON, JR. | ) | |
| RALPH B. PFEIFFER, JR. | ) | |
| MARK JOHNSTON, | ) | CASE NO. 2:21-cv-00469-SMD |
| TERESA K. THORNE | ) | |
| and GASP, INC., | ) | |
| | ) | **COMPLAINT FOR DECLARATORY** |
| Plaintiffs, | ) | **AND EQUITABLE RELIEF** |
| | ) | |
| v. | ) | |
| | ) | |
| ALABAMA PUBLIC SERVICE | ) | |
| COMMISSION; TWINKLE ANDRESS | ) | |
| CAVANAUGH, in her official capacity | ) | |
| as President of the Alabama Public Service | ) | |
| Commission; JEREMY H. ODEN, in his | ) | |
| official capacity as Commissioner of the | ) | |
| Alabama Public Service Commission; | ) | |
| and CHRIS "CHIP" BEEKER, in his | ) | |
| official capacity as Commissioner of the | ) | |
| Alabama Public Service Commission, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure and Local Rule 15.1, Plaintiffs James H. Bankston, Jr., Ralph B. Pfeiffer, Jr., Mark Johnston, Teresa K. Thorne, and GASP, Inc., file this First Amended Complaint for the sole purpose of adding the three Commissioners as party defendants. Plaintiffs hereby allege as follows:

### <u>SUMMARY OF ACTION</u>

1.      This is an enforcement action pursuant to Section 210(h)(2)(B) of the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. § 824a-3(h)(2)(B). Plaintiffs bring this

action against the Defendants Alabama Public Service Commission ("Commission"), a state regulatory authority under PURPA, and Twinkle Andress Cavanaugh, Jeremy H. Oden, and Chris "Chip" Beeker, acting in their official capacities as Commissioners of the Alabama Public Service Commission, for their failure to implement requirements of PURPA that preclude regulated utilities from charging unjust and discriminatory rates for the sale of electricity to "qualifying facilities" ("QFs"), a category that includes customers who own solar generation.[1] Defendants have failed to implement PURPA by allowing Alabama Power Company ("Alabama Power" or "the Company") to charge unjust, unreasonable and discriminatory rates for "back-up power" service to Plaintiffs and other customers who own solar generation.[2] The back-up power charges unlawfully approved by the Defendants are stifling the growth of customer-sited solar across the lower two-thirds of Alabama served by Alabama Power. As a result, Alabama, despite its abundance of sunshine, lags almost every other state in the U.S. in customer-sited solar deployment.

2.     In 1978 Congress passed PURPA, a law intended to promote the development of small-scale renewable energy generation, including rooftop solar generation used by customers to offset and reduce purchases from their utility. PURPA prohibits utilities from engaging in price discrimination when buying or selling supplemental power from or to small energy producers. To that end, PURPA requires that the rates charged to such customers be just and reasonable and in the public interest, and that the rates not discriminate against them in comparison to rates for sales

---

[1] PURPA uses the term "qualifying facility" to refer to small power production facilities that use biomass, waste, or renewable resources, including wind, solar and water, to produce electricity. 45 Fed. Reg. 12,214, 12,215 (Feb. 25, 1980) ("FERC Order No. 69").

[2] As discussed in more detail below, the charges are assessed pursuant to Alabama Power's Rate Rider RGB, which applies on top of the customer's underlying electric rate, such as Rate FD ("Family Dwelling"), which is Alabama Power's standard residential rate. Rate Rider RGB's terms, conditions and charges apply by virtue of the customer having installed on-site, non-emergency generation that is interconnected and operating in parallel with the Company's system.

to other customers. 18 C.F.R. § 292.305(a). Congress recognized that without such a requirement, utilities could charge unreasonable or discriminatory rates to discourage customer investment in on-site renewable generation. *FERC v. Mississippi*, 456 U.S. 742, 750–51 (1982).

3.      As the state agency with regulatory authority over Alabama Power, the Commission is required to implement PURPA's protections, which it may do by issuing regulations, adjudicating disputes between qualifying facilities and their electric utilities, or any other action reasonably designed to implement PURPA's requirements. 45 Fed. Reg. 12,214, 12,236–37 (Feb. 25, 1980).

4.      The Defendants have failed to implement PURPA's requirements for just, reasonable and nondiscriminatory rates for sales by approving new charges for back-up power service to Alabama families, schools, and small businesses who invest in on-site solar to lower their consumption from the grid and reduce their electric bills. Then, in a dispute between Plaintiffs and Alabama Power over the new charges, the Defendants allowed Alabama Power to increase the charges despite undisputed evidence that solar customers cost less to serve than customers without solar.

5.      As a result of Defendants' failure to implement PURPA's protections for Alabama Power customers, Plaintiffs and others like them pay more for the same amount of electric service than customers who reduce their electricity usage by other means, such as by installing energy efficient lighting or appliances. Such differential treatment is unjust and discriminatory under PURPA. The charges for back-up power service destroy the economics of private solar installations, robbing Plaintiffs and others like them of their expected savings and prolonging the payback period on their investments. These charges are the primary reason that private solar

investment in Alabama Power's service territory, comprising most of Alabama, significantly lags that of other solar-rich states.

6.     Through this action, Plaintiffs ask the Court to compel Defendants to implement PURPA's rates for sales provisions for the protection of Alabama Power customers.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1331. Plaintiffs' claims for relief are provided by federal statute. 16 U.S.C. § 824a-3(h)(2)(B).

8.     Plaintiffs satisfied the perquisites in 16 U.S.C. § 824a-3(h)(2)(B) for this lawsuit by petitioning the Federal Energy Regulatory Commission ("FERC") to enforce the requirements of 16 U.S.C. § 824a-3(f) and 18 C.F.R. § 292.305 on March 31, 2021. A copy of that petition is attached as Exhibit A. On June 1, 2021, FERC issued a Notice of Intent Not to Act (its customary practice in such situations), stating that "[o]ur decision not to initiate an enforcement action means that Petitioners may themselves bring an enforcement action against the Alabama Commission in the appropriate court." A copy of FERC's Notice is attached as Exhibit B.

9.     In a separate joint concurrence filed June 2, 2021, the Chairman of FERC, Richard Glick, and fellow Commissioner Allison Clements wrote to express their "concern that the Alabama Public Service Commission may be violating [FERC's] PURPA regulations, undermining the statute's purpose of encouraging Qualifying Facilities." The Chairman and Commissioner found that "Petitioners have presented a strong case that the Alabama Commission failed to adhere to the regulations set forth in FERC Order No. 69, violating the requirements of PURPA Section 210." A copy of the Joint Concurrence is attached as Exhibit C.

10.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) because the Defendant Alabama Public Service Commission and the Defendants in their capacities as Commissioners of

the Alabama Public Service Commission are located in this district and are in control of the state regulatory authority responsible for implementing PURPA in this district.

## PARTIES

11.     Plaintiff James H. Bankston, Jr., M.D., is a residential customer of Alabama Power and the owner of a 1.86 kilowatt ("kW") rooftop solar photovoltaic ("PV") system, which is a "small power producer" within the meaning of 16 U.S.C. § 824a-3(h)(2)(B) and a "qualifying facility" ("QF") under 18 C.F.R. § 292.203(a). Dr. Bankston interconnected his solar facility with Alabama Power's system in April 2016 and thereby became subject to monthly charges for back-up power service under Alabama Power's Rate Rider RGB. Dr. Bankston's principal place of business for his solar facility is in Tuscaloosa, Alabama.

12.     Ralph B. Pfeiffer, Jr., M.D., is a residential customer of Alabama Power and the owner of a 3.36 kW rooftop solar PV system, which is a "small power producer" within the meaning of 16 U.S.C. § 824a-3(h)(2)(B) and a QF under 18 C.F.R. § 292.203(a). Dr. Pfeiffer interconnected his solar facility with Alabama Power's system in April 2017 and thereby became subject to monthly charges for back-up power service under Alabama Power's Rate Rider RGB. Dr. Pfeiffer's principal place of business for his solar facility is in Mobile, Alabama.

13.     Reverend Mark Johnston is a residential customer of Alabama Power and the owner of an approximately 6 kW ground-mounted solar PV system, which is a "small power producer" within the meaning of 16 U.S.C. § 824a-3(h)(2)(B) and a QF under 18 C.F.R. § 292.203(a). Rev. Johnston interconnected his solar facility with Alabama Power's system in May 2017 and thereby became subject to monthly charges for back-up power service under Alabama Power's Rate Rider RGB. Rev. Johnston's principal place of business for his solar facility is in Double Springs, Alabama.

14.     Teresa K. Thorne is a residential customer of Alabama Power and the owner of a 4 kW rooftop solar PV system, which is a "small power producer" within the meaning of 16 U.S.C. § 824a-3(h)(2)(B) and a QF under 18 C.F.R. § 292.203(a). Ms. Thorne interconnected her solar facility with Alabama Power's system in September 2015 and thereby became subject to monthly charges for back-up power service under Alabama Power's Rate Rider RGB. Ms. Thorne's principal place of business for her solar facility is in Springville, Alabama.

15.     GASP, Inc. ("GASP") is an Alabama § 501(c)(3) nonprofit organization headquartered in Birmingham, Alabama and an Alabama Power customer. GASP's business address is 2320 Highland Avenue South, Suite 270, Birmingham, Alabama 35205. GASP seeks to improve the environment, economy and public health of Alabama. GASP has over 1,400 members in Alabama, including members adversely affected by the charges that Alabama Power levies for supposed back-up power service against on-site solar generating systems. GASP has associational standing to bring this action on behalf of its members who are QFs, including Plaintiffs Mark Johnston and Teresa K. Thorne. Increasing renewable energy opportunities in Alabama, which includes protecting its QF members from discriminatory rates for electric service, is central to GASP's mission.

16.     The Defendants are the Alabama Public Service Commission and the Commissioners of the Alabama Public Service Commission. The Commission is a state agency charged with regulating the rates charged and services provided by public utilities in Alabama, including Alabama Power Company, the state's largest investor-owned monopoly utility, which serves some 1.45 million customers in Alabama. The Commissioners control the entity responsible for implementing PURPA's protections as to regulated utilities in Alabama, including the rates

such utilities may charge for sales of electricity to QFs. 18 C.F.R. § 292.401(a). Defendants' address is 100 N. Union Street, RSA Union Building, Montgomery, Alabama 36104.

## LEGAL BACKGROUND

17.     Congress enacted PURPA to encourage Americans to develop renewable energy and reduce their dependence on traditional fossil fuels. H.R. Rep. No. 95-496(IV), 1978 U.S.C.C.A.N. 8454, 1977 WL 9621, at *14 (1978); *FERC v. Mississippi*, 456 U.S. at 750–51 (1982). To further that goal, PURPA prohibits electric utilities from charging discriminatory rates to customers who generate their own renewable energy. 16 U.S.C. §§ 824a-3(a), (c); *FERC v. Mississippi*, 456 U.S. at 750–51. Congress deemed such protection necessary to prevent utilities from using discriminatory rates to discourage and therefore undermine Congress's goal of increasing small power generation. Joint Explanatory of the Committee of Conference, P.L. 78-617, reprinted in *FERC Statutes and Regulations* ¶ 5151, at 5105–06; 45 Fed. Reg. at 12,228–29.

18.     Pursuant to Congress's goal of promoting small power generation, FERC adopted regulations prohibiting unreasonable and discriminatory rates for sales to customers with their own generation. Plaintiffs and others whose small power production facilities use solar to produce electric power are qualifying facilities ("QFs") under PURPA.

19.     FERC's implementing regulations satisfy Congress's mandate by requiring that rates for the sale of electricity to QFs "[s]hall not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility." 18 C.F.R. § 292.305(a)(1)(ii). Rates for QFs may differ only if they are "based on accurate data and consistent systemwide costing principles" and do not differ from rates charged "to the utility's other customers with similar load or other cost-related characteristics." *Id.* § 292.305(a)(2).

20.     In its Order No. 69, FERC explained that its rates for sales requirements contemplate rate formation based on "traditional ratemaking (*i.e.*, cost-of-service) concepts" such

that a self-generating customer should be charged the same rate applicable to a non-generating customer within the same class "unless the electric utility shows that a different rate is justified on the basis of sufficient load or other cost-related data." 45 Fed. Reg. at 12,228.

21. Thus, to develop separate rates for QFs, a utility must rely on systemwide costing principles to show that the rate "charged to a comparable customer without its own generation is not appropriate," and thereafter, base any different rate for customer-generators "upon those data and principles." *Id.* Even then, however, "[t]he utility may only charge such rates on a nondiscriminatory basis," such that the QF "will not be singled out to lose any interclass or intraclass subsidies to which it might have been entitled had it not generated part of its electric energy needs itself." *Id.*

22. As the state agency with regulatory authority over Alabama Power, the Commission is responsible for implementing PURPA's requirements governing rates for sales of electricity from regulated utilities to QFs.

23. By approving Alabama Power's unjust and discriminatory charges for back-up power service under Rate Rider RGB, Defendants have failed to implement PURPA's rates for sales provisions set forth in 18 C.F.R. § 292.305.

24. When state regulators like Defendants fail to implement FERC's regulations as required by law, owners of small renewable generation systems like Plaintiffs can request the district courts to compel proper implementation. *See* 16 U.S.C. § 824a-3(f) (requiring state regulatory authorities like the Commission to implement FERC's PURPA regulations), § 824a-3(h)(2)(B) (authorizing small power producers, following petition to FERC and its decision not to enforce, to initiate action in federal court to require state regulatory authority to comply with

FERC's PURPA regulations; district court "may issue such injunctive or other relief as may be appropriate.").

## **FACTUAL BACKGROUND**

### The Commission Approved Unlawful New Charges on Customers with Solar Generation

25.     On December 20, 2012, Alabama Power filed with the Commission certain proposed revisions to its Rate Rider RGB. By its terms, Rate Rider RGB applies to all customers with non-emergency on-site generation interconnected and operating in parallel with the Company's electrical system. The rate rider includes the rates, terms and conditions for three services: Supplementary, Back-Up and Maintenance Power.

26.     A version of Rate Rider RGB has been on file with the Commission since early 1988. However, it was not until the changes filed on December 20, 2012—the so-called "Revision Fifth"—that Alabama Power proposed to begin assessing charges for "back-up power service"[3] against small customer generators taking service under the Company's standard residential tariff (Rate FD – "Family Dwelling"), alternative residential tariff (Rate RTA), standard school tariff (Rate SCH), and small commercial tariff (Rate LPS).

27.     Pursuant to Back-up Power Part I.B of the Revision Fifth, the Company would, for the first time, assess a "Capacity Reservation Charge" of $5.00 per kW against these customers for back-up power service. The charges would apply based on the size of the customer's self-generation equipment. For example, a customer with a 5 kW solar array would now owe the

---

[3] Under PURPA, "back-up power" is electric energy or capacity supplied by an electric utility to replace energy ordinarily generated by a customer's own generation facility during an unscheduled outage of that facility. *See* 18 C.F.R. § 292.101(b)(9) (defining back-up power). It is different and distinct from "supplementary power," which is energy or capacity supplied by an electric utility that is regularly used by the customer in addition to that which the customer's own facility generates. *Id.* § 292.101(b)(8). Plaintiffs did not request back-up power service from Alabama Power and do not agree that it is a distinct service they need or should be required to pay for on top of paying fully for their supplementary power needs.

Company $25.00 per month for back-up service ($300 per year or $9,000 over the expected thirty-year lifespan of a typical system), in addition to mandatory fixed charges and charges based on the amount of electricity used by the customer.[4]

28.　　The cover letter accompanying the Company's December 20, 2012 filing made no reference to the proposed new charges, instead describing the filing merely as "updates" that would "clarify the applicability of the rate rider, while expanding the number of rate options that are eligible to take service under the rider." The letter further described the revisions as including "updated rate definitions and service options to reflect changes in technology and system costs."

29.　　The Commission approved the revisions just three weeks later. The Commission held no public hearing and received no testimony before approving the new charges, which its order made effective with May 2013 billings.[5]

30.　　While the charges nominally apply to any form of non-emergency customer-sited generation, they were developed based upon solar production data and with the expectation that customer solar adoption was beginning to take root in Alabama.

31.　　When the Commission adopted the new charges in May 2013, there were just 79 customer accounts subject to Rate Rider RGB (and those customers were exempted from the charges).

32.　　As of November 2019, there were only about 132 customers subject to the charges, representing a total combined capacity of just over 650 kW (compared to a total system capacity for Alabama Power of approximately 13,000 megawatts ("MW")). By comparison, sister utility

---

[4] Of the covered customer classes, only the Rate RTA customer could avoid the Capacity Reservation Charge, but only by opting to pay a 70¢ per kilowatt-hour ("kWh") charge ("Alternative Rate RTA Charge") during the weekday hours of 3:00 to 5:00 p.m. of the summer season, June through September (summer peak hours). Rate RTA is a time varying rate that includes a demand charge; the Alternative Rate RTA charge is more than three times the otherwise applicable rate under Rate RTA.
[5] Solar customers who had filed for interconnection prior to May 2013 were exempted from paying the new charges.

Georgia Power Company, which assesses no charge for back-up power service, has more than twelve times the amount of on-site residential solar in its service territory than Alabama Power.

<u>Defendants Unlawfully Approved Increases to the Charges following Complaint</u>

33.     In April 2018, Plaintiffs Bankston, Pfeiffer and GASP filed a complaint with the Commission alleging that the charges assessed for back-up service were unfair, unreasonable, unjust, discriminatory, contrary to the public interest and otherwise unlawful under Alabama law ("the Commission Complaint Proceeding").

34.     Alabama Power responded by seeking to increase the Capacity Reservation Charge to $5.42/kW (later lowered to $5.41/kW due to an Alabama Power error) and the Alternative Rate RTA Energy Charge to 71¢/kWh.

35.     On November 21, 2019, Defendants held a limited hearing in which the Company's sole witness was cross-examined and the opportunity was then provided to cross-examine Plaintiffs' sole witness.

36.     In the Commission Complaint Proceeding, Alabama Power sought to defend the charges as necessary to fully recover the fixed (i.e., system infrastructure) costs associated with providing electricity to its customers. Rate FD is an "energy only" rate structure, meaning that Rate FD customers (who are most of Alabama Power's customers) pay for service—both the energy provided to them and the fixed system costs associated with providing it—primarily through a price per kWh charge applied to their electricity consumption. Alabama Power argued that without separate charges for back-up power service, it would be unable to fully recover its

fixed system costs because solar customers consume less electricity from the grid and pay lower bills.[6]

37.     However, Alabama Power's own evidence showed that solar customers are less costly to serve than comparable customers without solar. The solar customer is less costly to serve from both a variable energy and fixed capacity (system infrastructure costs) perspective.

38.     In addition, the undisputed evidence showed that to the extent of their continuing need for electric service to supplement their system's production, solar customers pay fully for the fixed costs associated with such supplementary service in the same way that non-solar customers pay for service generally—i.e., by the kWh.

39.     The undisputed evidence showed that the charges derive entirely from Alabama Power's assumed under-collection of revenue from solar customers because solar customers' private investments allow them to purchase less electricity from the utility. However, Alabama Power does not assess similar charges against customers who reduce their usage the same amount by means other than deploying on-site generation. For example, customers are not similarly charged for investing in energy efficiency improvements in their homes.

40.     Alabama Power admitted that it has no right to depend on any particular level of usage and corresponding revenue recovery from any customer, and that customers are free to reduce their electricity consumption from the utility without penalty.

41.     Alabama Power made no showing that solar customers' usage patterns fall outside the range that the Company anticipated and planned for when it designed Rate FD's consumption-

---

[6] On essentially the same basis Alabama Power defended the need to charge the same Capacity Reservation Charge to schools on Rate SCH and small businesses on Rate LPS, and the Alternative RTA charge to customers on Rate RTA. Plaintiffs Bankston, Pfeiffer, Johnston and Thorne are all Rate FD customers.

based rate to fully recover fixed system costs from the Rate FD class a whole, considering the diversity of usage patterns endemic to that standard residential class.

42.     Following the hearing, the parties submitted proposed orders. Despite the clear evidence that the charges have no cost-of-service basis and discriminate against customers who elect to reduce their energy usage by deploying small-scale solar, Commission Staff recommended that the Commission dismiss Plaintiffs' complaint and approve the increased charges for back-up power service.

43.     On October 16, 2020, the Defendants issued an Order adopting Staff's recommendation and giving effect to Alabama Power's requested increases. As a result, Plaintiffs Bankston, Pfeiffer, Johnston and Thorne are required to pay the increased monthly charges for "back-up power service," a service they neither requested nor need, despite being less costly to serve.

**COUNT ONE: FAILURE TO IMPLEMENT 18 C.F.R. § 292.305(a).**

44.     Plaintiffs incorporate paragraphs 1 through 43 above.

45.     FERC's PURPA regulations require that rates for sales to QFs "[s]hall be just and reasonable and in the public interest" and "[s]hall not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility." 18 C.F.R. §§ 292.305(a)(1)(i), (ii).

46.     Rates for sales are not discriminatory if "based on accurate data and consistent systemwide principles" and provided that "such rates apply to the utility's other customers with similar load or other cost-related characteristics." *Id.* § 292.305(a)(2).

47.     FERC has explained that its rates for sales requirements contemplate rate formation based on "traditional ratemaking (*i.e.*, cost-of-service) concepts" such that self-generating

customers should be charged the same rate as other customers in the same class "unless the electric utility shows that a different rate is justified on the basis of sufficient load or other cost-related data." 45 Fed. Reg. at 12,228.

48.    Alabama Power's monthly charges for back-up power service are not based on accurate data demonstrating that the rates charged to non-solar customers are inappropriate for solar customers because of a difference in electricity loads or costs.

49.    In fact, Alabama Power's own analysis underpinning the charges demonstrated unequivocally that solar customers are *less costly* to serve than customers without solar.

50.    In formulating the charges, Alabama Power did not evaluate the net usage[7] of Rate FD customers after adopting solar. The Company instead simply assumed that a "representative solar customer" would—as a result of their system's expected production – annually consume less utility-supplied electricity than the representative customer without solar.[8] The resulting difference in *revenue* to the utility—not any difference in *cost to serve*—is the true basis for the charges.

51.    Without evaluating net usage data, the Company lacked any basis for comparing solar and non-solar customers' loads and costs and failed to demonstrate that different rates are appropriate for solar customers due to a difference in loads and costs between solar and non-solar customers.

---

[7] Net usage means the customer's usage net of their solar system's production. Alabama Power does not measure the electricity produced by a customer's on-site solar installation; the Company only measures the customer's usage of grid-supplied electricity. Net usage is how the customer "appears" to Alabama Power after installing on-site solar— i.e., as a reduced usage customer.

[8] Specifically, the Company's analysis showed that the representative solar customer would consume 10,127 kWh annually instead of their assumed pre-solar consumption of 15,485 kWh, resulting in 5,358 fewer kWh sold. An average residential customer in Alabama consumes approximately 14,412 kWh annually, according to data from the U.S. Energy Information Administration (EIA).

52.     The charges for back-up power service have nothing to do with the actual usage patterns of solar customers, including their electricity demand during the peak hours that drive infrastructure costs.

53.     In developing the charges, Alabama Power had no information that solar customers were driving any specific infrastructure costs relating to interconnection and reliable operation of the grid.

54.     Alabama Power conceded that it has not had to incur any additional capacity costs specifically as a result of the extremely limited amount of customer-sited solar in its service territory.

55.     The back-up power service charges are based purely on *revenue decreases* that the Company anticipates from customer solar adoption, not from any *cost of service increase* for providing electric service to solar customers during unscheduled outages of solar equipment.

56.     In addition to lacking any basis in accurate data regarding cost to serve, Alabama Power's rates for back-up power service are not based on "consistent systemwide costing principles," as required by 18 C.F.R. § 292.305(a)(2).

57.     The charges require solar customers to pay significantly more for the same level of service than non-solar customers.

58.     Rate Rider RGB's back-up charges collect class demand[9] costs—which are common to QFs and non-QFs—differently, based on different pricing policies. A solar QF on Rate FD pays for class demand costs twice: once through the Capacity Reservation Charge under Rate

_____

[9] Demand costs are those that vary with the kW demand imposed by the customer. They include such fixed system costs as the generation and transmission facilities needed to serve the customer class. They are categorically different from energy costs, which vary with the amount of energy, in kWh, consumed by the customer over the billing period. Rate FD is designed to recover both types of costs primarily through a volumetric energy rate – i.e., a rate applied against the number of kWh consumed by the customer. Under such a rate design, any customer reducing their usage pays less toward fixed system costs.

Rider RGB, and again through every kWh purchased under Rate FD's volumetric energy rate for their "supplementary service" needs. Meanwhile, non-QFs under Rate FD pay for class demand costs based solely on their volumetric energy usage.

59.     Hence, while all residential customers on Rate FD—with or without solar—pay the same rate for each kWh of electricity from Alabama Power,[10] and the same basic customer service charge,[11] only self-generating customers must pay an additional charge for "back-up power service."

60.     A charge may not single out QFs for different treatment if non-QFs in the same class have "similar load or other cost-related characteristics." 18 C.F.R. § 292.305(a)(2).

61.     As approved by Defendants, the Rate Rider RGB charges for back-up power service impose higher and additional charges for customers who self-supply some of their electricity needs with their own solar generation compared to customers who do not.

62.     By singling out self-generating customers for different treatment based on reduced usage (and not based on cost to serve), Alabama Power's charges for back-up power service are unjust, unreasonable and discriminatory.

63.     By unlawfully stifling customer solar development in most of Alabama, the charges are contrary to the public interest.

64.     Defendants failed to require Alabama Power to provide data showing a difference in loads and costs by solar customers compared to non-solar customers, as was required to justify assessing a separate charge against them.

_____

[10] Rate FD assesses a charge of 10.6618 ¢/kWh for the first 1,000 kWh in the months of June through September and for the first 750 kWh in the remaining months of the year. For the summer months, the charge is 10.9147¢/kWh for all consumption over 1,000 kWh; for the remaining months, the charge is 9.4618¢/kWh for all consumption over 750 kWh.

[11] Rate FD assesses a base charge of $14.50 per month per customer.

65.     Defendants also failed to require Alabama Power to base Rate Rider RGB's charges for back-up power service on consistent systemwide costing principles.

66.     The back-up power service charges assessed against solar customers are discriminatory under 18 C.F.R. § 292.305(a)(2) because they do not "apply to the utility's other customers with similar load or other cost-related characteristics."

67.     Defendants' approval of the back-up power service charges therefore constitutes a failure to implement 18 C.F.R. § 292.305(a).

## COUNT TWO: FAILURE TO IMPLEMENT 18 C.F.R. § 292.305(b)

68.     Plaintiffs incorporate paragraphs 1 through 67 above.

69.     FERC's PURPA regulations make clear that back-up power is an additional service to be provided by electric utilities "[u]pon request of a qualifying facility," and not as a matter of course. 18 C.F.R. § 292.305(b)(1). *See also* 45 Fed. Reg. at 12,215 ("These rules also provide that electric utilities . . . must provide certain types of services which *may be requested* by qualifying facilities to supplement or back up those facilities' own generation.") (emphasis added).

70.     Plaintiffs Bankston, Pfeiffer, Johnston and Thorne never requested back-up power service from Alabama Power. As preexisting customers, they simply sought to interconnect their systems to the grid, at which point they became subject to the Capacity Reservation Charge.

71.     When their systems do not generate electricity (e.g., at night), these Plaintiffs expect and are charged for supplementary service at the consumption-based rate otherwise applicable to customers in the Rate FD class.

72.     Unlike an industrial customer with large on-site generation, a residential solar customer is unlikely to experience forced outages (i.e., an unexpected failure of solar equipment) necessitating a separate arrangement with the utility to hold equivalent capacity in reserve. In the

rare event in which a customer's solar array is unexpectedly inoperable, the customer resumes status as a full requirements customer, paying fully for the variable and fixed system costs occasioned by their usage through each kWh they consume from the grid.

73.     In contrast, solar customers do require supplementary power—defined as energy or capacity that a customer uses "in addition to" that which the customer generates on their own. 18 C.F.R. § 292.101(b)(8).

74.     By interconnecting their systems, Plaintiffs expected to remain Alabama Power customers and to pay for their supplementary power needs by the kWh in the same manner as other Rate FD customers.

75.     Back-up power serves a  different function.  It is designed to replace what the customer would ordinarily generate during an unscheduled outage of the customer's facility. 18 C.F.R. § 292.101(b)(9).

76.     Alabama  Power  nevertheless  views  back-up  power  service  as  covering  *all* reductions in on-site generation, including "unscheduled" outages associated with the absence of sunlight.

77.     Alabama Power's sweeping conception of back-up power service includes expected deviations in system output, which are the province of supplementary power service, and which the Company already accounted for in developing the charges.

78.     Alabama Power acknowledges that it would be inappropriate to assess back-up power service charges for supplementary power service. But the Company's failure to make a clear analytical distinction between the two services means solar customers are over-charged for supplementary power service.

79. Plaintiffs should not have to pay for a service they did not request (and do not need) when the effect is to over-charge them for a service they do require—supplementary service.

80. Defendants failed to implement 18 C.F.R. § 292.305(b) by allowing Alabama Power to assess charges for back-up power from Plaintiffs and others who did not request back-up power service and require only supplementary service.

## COUNT THREE: FAILURE TO IMPLEMENT 18 C.F.R. § 292.305(c)

81. Plaintiffs incorporate paragraphs 1 through 80 above.

82. Under FERC's PURPA regulations rates for back-up power service "shall not be based upon an assumption (unless supported by factual data) that forced outages or other reductions in electric output by all qualifying facilities on an electric utility's system will occur simultaneously, or during the system peak, or both." 18 C.F.R. § 292.305(c).

83. In its discussion of this provision, FERC noted that QFs exhibit diversity in size and load requirements. As a result, "an electric utility supplying back-up or maintenance power to qualifying facilities will not have to plan for reserve capacity to serve such facilities on the assumption that every facility will use power at the same moment." 45 Fed. Reg. at 12,229.

84. In supposed deference to this requirement, Alabama Power assumed that solar QFs across its service territory experience simultaneous forced outages 65% of the time. As a result, solar customers would receive credit for only 35% of the demand savings otherwise attributable to solar deployment. The effect of this assumption is that for every 10 kW of solar on the system, Alabama Power asserts it must hold 6.5 kW in reserve to cover simultaneous forced outages of solar equipment.

85. Alabama Power provided no empirical support for that assumption but instead simply exercised its "informed judgment."

86.     The Company's "informed judgment" cannot lawfully substitute for the data-driven analysis of demand required by Section 292.305(c) of FERC's PURPA regulations.

87.     Even accepting Alabama Power's assumption that customer solar systems experience simultaneous forced outages 65% of the time, solar customers still produce capacity savings relative to non- solar customers within the same rate class. For every 10 kW of customer-sited solar, 3.5 kW of system capacity becomes available for use by other customers.

88.     In contrast, for a non-solar customer with a peak demand of 10 kW, the Company must be prepared to meet that 10 kW of demand at all times, including during system peak. Thus, even accepting the Company's assumption, it shows that self-generating customers cost less to serve because they allow the Company to hold less capacity in reserve to serve their needs.

89.     As a result, Alabama Power has not demonstrated that any separate charge for back-up power service against solar customers is justified.

90.     Any attempt by the utility to justify a separate charge for back-up power service (for customers who need and request such service) must be grounded in real-world data regarding simultaneous forced outages of customer-sited solar systems.

91.     Defendants failed to implement 18 C.F.R. § 292.305(c) by allowing Alabama Power to base its charges for back-up power service upon factually unsupported assumptions about simultaneous forced outages of customer-sited solar equipment.

## REQUEST FOR RELIEF

Defendants' failures to implement 18 C.F.R. §§ 292.305(a), (b) and (c) are actionable under 16 U.S.C. §§ 824a-3(f) and (h)(2)(B).

WHEREFORE, Plaintiffs request that the Court order the following relief:

A.      Declare that by approving and allowing Alabama Power to impose the Rate Rider RGB charges for back-up power service, Defendants have failed to implement the requirements of 18 C.F.R. § 292.305(a)(1) that rates for sales to QFs be just, reasonable, in the public interest, and nondiscriminatory in comparison to rates for sales to other customers served by Alabama Power.

B.      Declare that by approving and allowing Alabama Power to impose the Rate Rider RGB charges for back-up power service, Defendants have failed to implement the requirements of 18 C.F.R. § 292.305(a)(2) that rates for sales be based on accurate data and consistent systemwide costing principles.

C.      Declare that by approving and allowing Alabama Power to impose the Rate Rider RGB charges for back-up power service, Defendants have failed to implement the requirements of 18 C.F.R. § 292.305(b) that back-up power is to be provided only upon request of a QF.

D.      Declare that by approving and allowing Alabama Power to impose the Rate Rider RGB charges for back-up power service, Defendants have failed to implement the requirements of 18 C.F.R. § 292.305(c) that rates for sales of back-up power service, assuming such service is needed and requested by the QF, must be based upon factually supported assumptions about simultaneous forced outages of customer-sited solar equipment.

E.      Order Defendants to implement 18 C.F.R. § 292.305(a) by requiring the same charges for utility-supplied electricity to solar and non-solar customers, unless and until Alabama Power can justify any different charges based on accurate data showing that the costs and usage of solar customers are outside the range of costs and usage of non-solar customers in the same class.

F.      Order Defendants to implement 18 C.F.R. § 292.305(a) by imposing only those rates for solar customers that are based on systemwide costing principles, such that similar loads and usage by solar and non-solar customers result in similar charges.

G. Order Defendants to direct Alabama Power to immediately cease collecting the Capacity Reservation Charge and Alternative Rate RTA charges.

H. Order Defendants to implement 18 C.F.R. § 292.305(b) by allowing Alabama Power to collect charges for back-up power service only from customers who specifically request such service.

H. Order Defendants to implement 18 C.F.R. § 292.305(c) by requiring Alabama Power to furnish factual data supporting any assumptions about simultaneous forced outages of customer-sited solar equipment.

I. Order Defendants to pay Plaintiff's attorneys' fees and costs to the extent provided by law.

J. Order such other relief as the Court deems just and equitable.

Respectfully submitted this the 2nd day of August, 2021.

/s/ Keith Johnston
Keith A. Johnston (ASB-0093-E68J)
Christina A. Tidwell (ASB-9696-D10R)
Southern Environmental Law Center
2829 2nd Avenue South, Suite 282
Birmingham, Alabama 35233
Tel:    (205) 745-3060
Fax:    (205) 745-3064
Email: kjohnston@selcal.org
        ctidwell@selcal.org

Kurt D. Ebersbach (ASB-1716-X21R)
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Tel:    (404) 521-9900
Fax:    (404) 521-9909
Email: kebersbach@selcga.org

*Attorneys for Plaintiffs GASP, Inc., Mark Johnston and Teresa K. Thorne*

/s/ Clay Ragsdale
Clay Ragsdale (ASB-0308-A62R)
Allison Riley (ASB-0594-E28M)
Ragsdale LLC
517 Beacon Parkway W.
Birmingham, AL 35209
Tel:     (888)727-1087
Email: clay@ragsdalellc.com
        allison@ragsdalellc.com

*Attorneys for Plaintiffs James H. Bankston, Jr. and Ralph B. Pfeiffer, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2nd, 2021, a copy of the foregoing FIRST AMENDED COMPLAINT was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by U.S. First Class mail at the addresses listed below. Parties may access this filing through the Court's electronic filing system.

Walter L. Thomas, Jr.
Secretary
Alabama Public Service Commission
100 N. Union St., Suite 950
Montgomery, AL 36104

The Honorable Steve Marshall
Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36104

/s/ Keith Johnston
*Attorney for Plaintiffs GASP, Inc., Mark Johnston and Teresa K. Thorne*

# EXHIBIT A

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION


| | | |
|---|---|---|
| JAMES H. BANKSTON, JR. | ) | |
| RALPH B. PFEIFFER, JR. | ) | Docket No. _____ |
| MARK JOHNSTON, | ) | |
| TERESA K. THORNE, | ) | |
| and GASP, INC. | ) | |


## PETITION FOR ENFORCEMENT UNDER THE
## PUBLIC UTILITY REGULATORY POLICIES ACT OF 1978

Pursuant to Section 210(h)(2)(B) of the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. § 823a-3(h)(2)(B), James H. Bankston, Jr., Ralph B. Pfeiffer, Jr., Mark Johnston, and Teresa K. Thorne ("Alabama Solar QFs"), and GASP, Inc. (collectively, "Petitioners") hereby petition the Federal Energy Regulatory Commission ("FERC" or "Commission") to initiate an enforcement action against the Alabama Public Service Commission ("Alabama PSC"). Petitioners ask FERC to compel the Alabama PSC to implement this Commission's PURPA regulations requiring just, reasonable and non-discriminatory rates for the sale of electricity to solar qualifying facilities ("QFs") served by Alabama Power Company ("Alabama Power" or "the Company").

In January 2013, the Alabama PSC approved revisions to Alabama Power's Rate Rider RGB tariff.[1] By its terms, Rate Rider RGB applies to any customers connected to the Company's system who obtain any portion of their electric requirements from installed on-site, non-emergency generating capacity operating in parallel with the

---

[1] Ex. 1, Ala. Power Co., Rate Rider RGB (Supplementary, Back-up, or Maintenance Power) (Revision Fifth), at Back-Up Power Part I.B. (pages 4-5 of exhibit) (effective May 2013) [hereinafter 2013 Rate Rider RGB].

Company's system—a category that includes customers who are solar QFs under PURPA.[2] The revisions approved by the Alabama PSC in January 2013 imposed new charges for back-up power service on such customers, including a monthly "Capacity Reservation Charge" of $5.00/kilowatt (kW) based on the nameplate capacity of the customer's system.[3] In October 2020, following a limited hearing, the Alabama PSC approved revisions to Rate Rider RGB that increased the Capacity Reservation Charge to $5.41/kW.[4]

The Commission's PURPA regulations, 18 C.F.R. § 292.305(a)(1), require that rates for sales of electricity to QFs be "just and reasonable and in the public interest," and that they "not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility." As the Commission has explained, "[t]his section contemplates formulation of rates on the basis of traditional ratemaking (*i.e.*, cost-of-service) concepts."[5] Specifically, a QF "should be charged at a rate applicable to a non-generating [customer of the same customer class] unless the electric utility shows that a different rate is justified on the basis of sufficient load or other cost-related data."[6] A utility may charge a different rate to QFs only if it demonstrates "on the basis of accurate data and consistent system-wide costing principles" that "the rate that would be charged to a comparable customer without its own generation is not appropriate."[7] Absent such data, the rate for sales to QFs "shall be the rate that would be

---

[2] *Id.* at Applicability (page 2 of exhibit).
[3] *Id.* at Back-Up Power Part I.B. (pages 4-5 of exhibit).
[4] Ex. 2, Order, *Bankston, et al. v. Ala. Power Co.*, Docket Nos. 32767 & U-4226 (Ala. P.S.C. Oct. 16, 2020) [hereinafter RGB Rider Order]; Ex. 3, Ala. Power Co., Rate Rider RGB (Supplementary, Back-up, or Maintenance Power) (Revision Sixth) (effective Dec. 2020) [hereinafter 2020 Rate Rider RGB].
[5] Joint Explanatory of the Committee of the Conference, P.L. 78-617, reprinted in *FERC Statutes and Regulations* ¶ 5151, at p. 5105-06; 45 Fed. Reg. 12,214, 12,228 (Feb. 25, 1980) ("FERC Order No. 69").
[6] *Id.*
[7] *Id.*

charged to the class to which the qualifying facility would be assigned if it did not have its own generation."[8] Rates for sales to QFs shall be deemed non-discriminatory "to the extent that such rates apply to the utility's other customers with similar load or other cost-related characteristics."[9]

With inclusion of the charges for back-up service, Alabama Power's rates for sales to QFs, including customers with distributed solar generation, violate these FERC regulations. The back-up service rates are unjust and unreasonable, discriminatory and not based on cost-of-service principles. As a result of the charges, residential solar QFs in Alabama Power's service territory (as well as schools and small businesses that adopt solar) pay more than comparable customers without solar generation even though the solar QFs cost less to serve. The Alabama PSC's adoption of the charges for back-up service therefore constitutes a failure to properly implement FERC's electricity sales regulations, 18 C.F.R. § 292.305, within the meaning of 16 U.S.C. §§ 824a-3(f) and (h)(2)(B).[10]

Petitioners respectfully request that the Commission institute an enforcement action under Section 210(h) of PURPA[11] to compel the Alabama PSC to implement 18 C.F.R. § 292.305(a) by ordering Alabama Power to set non-discriminatory rates for sales to solar QFs. Petitioners understand that the Commission's enforcement authority under Section 210(h) is discretionary and that, due to time and resource constraints, the Commission routinely has refrained from exercising that authority, instead leaving it to

---

[8] *Id.*
[9] 18 C.F.R. § 292.305(a)(2).
[10] *ConocoPhillips Co. v. Dep't. of Water & Power, City of Los Angeles,* No. CV-07-5742-ABC (JTLx), 2018 WL 11422174, at *2-4 (C.D. Cal. June 20, 2008) (finding that a challenge to discriminatory rates for sales to QFs is an implementation claim).
[11] 16 U.S.C. § 824a-3(h).

petitioners to bring their own judicial enforcement actions.[12] In this case, however, the Commission should depart from its usual practice. As shown below, the charges lack any cost-of-service basis and result in solar QFs paying significantly more than comparable non-generating customers for the same level of service. The charges are therefore unjust and discriminatory in violation of 18 C.F.R. § 292.305(a).

Moreover, the back-up charges appear to be the highest assessed by any investor-owned utility in the country, and they clearly frustrate PURPA's core objective of encouraging QF development. Over the last eight years, the charges have stymied development of residential and small commercial solar power in Alabama, a state otherwise rich in solar potential.

Accordingly, for the reasons set forth in this Petition, the Commission should exercise its enforcement authority to ensure full and proper implementation of PURPA's protections in Alabama Power's service territory, which covers two-thirds of Alabama. However, should the Commission nevertheless decline to pursue an enforcement action, Petitioners respectfully urge the Commission to make findings and declarations pertinent to the issues at stake. Specifically, Petitioners alternatively urge the Commission to find and declare that the Alabama PSC's Order approving Rate Rider RGB's charges for back-up service violate Sections 292.305(a), (b), and (c) of the Commission's PURPA regulations because:

(1) The charges are not based on a cost-of-service study of solar QFs or other accurate data showing that those customers cost more to serve than non-solar customers in the same class;

---

[12] *See* Policy Statement Regarding the Commission's Enforcement Role Under Section 210 of the Public Utility Regulatory Policies Act of 1978, 23 FERC ¶ 61,304, 61,645 (1983).

(2) The charges are based on lost revenues resulting from reduced customer usage, which is not unique to solar adoption, making it *per se* discriminatory to single out QFs for differential treatment;

(3) The charges are not based on consistent systemwide costing principles because they apply a different pricing policy to solar customers, charging them more for the same level of service as non-solar customers;

(4) The charges are for a service that solar QFs did not request and result in overcharging them for supplementary service; and

(5) The charges rely on unreasonable and unsupported assumptions regarding the frequency of forced system outages of customer-sited solar equipment.

## I.    Description of Petitioners

James H. Bankston, Jr., M.D., is a residential customer of Alabama Power and the owner of a 1.86 kW rooftop solar photovoltaic (PV) system, which is a QF under 18 C.F.R. § 292.203(a). Section 292.203(d)(1) exempts this QF from certification filing requirements. Dr. Bankston interconnected his solar facility with Alabama Power's system in April 2016 and thereby became subject to the Rate Rider RGB's rates for back-up service. Dr. Bankston's principal place of business for his solar facility is 6408 Lake Vista Circle, Tuscaloosa, Alabama 35406.

Ralph B. Pfeiffer, Jr., M.D., is a residential customer of Alabama Power and the owner of a 3.36 kW rooftop solar PV system, which is a QF under 18 C.F.R. § 292.203(a). Section 292.203(d)(1) exempts this QF from certification filing requirements. Dr. Pfeiffer interconnected his solar facility with Alabama Power's system in April 2017 and thereby became subject to the Rate Rider RGB's rates for back-up service. Dr.

Pfeiffer's principal place of business for his solar facility is 3726 Dawes Road, Mobile, Alabama 36695.

Reverend Mark Johnston is a residential customer of Alabama Power and the owner of an approximately 6 kW ground-mounted solar PV system, which is a QF under 18 C.F.R. § 292.203(a). Section 292.203(d)(1) exempts this QF from certification filing requirements. Rev. Johnston interconnected his solar facility with Alabama Power's system in May 2017 and thereby became subject to the Rate Rider RGB's rates for back-up service. Rev. Johnston's principal place of business for his solar facility is 16266 Highway 195, Double Springs, Alabama 35553.

Teresa K. Thorne is a residential customer of Alabama Power and the owner of a 4 kW rooftop solar PV system, which is a QF under 18 C.F.R. § 292.203(a). Section 292.203(d)(1) exempts this QF from certification filing requirements. Ms. Thorne interconnected her solar facility with Alabama Power's system in September 2015 and thereby became subject to the Rate Rider RGB's rates for back-up service. Ms. Thorne's principal place of business for her solar facility is 193 Adamson Road, Springville, Alabama 35146.

GASP, Inc. ("GASP") is an Alabama § 501(c)(3) nonprofit organization headquartered in Birmingham, Alabama and an Alabama Power customer. GASP's business address is 2320 Highland Avenue South, Suite 270, Birmingham, Alabama 35205. GASP seeks to improve the environment, economy and public health of Alabama. GASP has over 1,400 members in Alabama, including members adversely affected by the charges that Alabama Power levies against on-site solar generating systems for back-up service. GASP advocates on behalf of its members, including Mark Johnston and Teresa

K. Thorne. GASP has associational standing to bring this petition and any subsequent litigation on behalf of its members.

## II.     Communications

Please address all notices and communications regarding this petition to the following persons who are also designated for service in this proceeding:

Kurt D. Ebersbach
Southern Environmental Law Center
Ten 10th Street, NW, Suite 1050
Atlanta, GA 30309
Phone: (404) 521-9900
Fax: (404) 521-9909
Email: kebersbach@selcga.org

Christina A. Tidwell
Keith A. Johnston
Southern Environmental Law Center
2829 2nd Ave S, Suite 282
Birmingham, AL 35233
Phone: (205) 745-3060
Fax: (205) 745-3064
Email: ctidwell@selcal.org
Email: kjohnston@selcal.org

Clay Ragsdale
Allison Riley
RAGSDALE LLC
517 Beacon Parkway W.
Birmingham, AL 35209
Phone: (205) 290-6800
Email: clay@ragsdalellc.com
Email: allison@ragsdalellc.com

Petitioners respectfully request waiver of Rule 203(b)(3) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.203(b)(3), to the extent necessary to permit designation of more than two persons for service on behalf of Petitioners in this proceeding.

## III.     Procedural and Factual Background

### A.  __The Alabama PSC's adoption of the charges.__

On December 20, 2012, Alabama Power filed with the Alabama PSC certain proposed revisions to its Rate Rider RGB.[13] By its terms, Rate Rider RGB applies to all

---

[13] Ex. 4, Letter from Nick C. Sellers, Ala. Power Co., to Walter Thomas, Secretary, Ala. Pub. Serv. Comm'n, Rate Rider RGB Supplementary, Back-up, or Maintenance Power (Docket No. U-4226) and

customers with non-emergency on-site generation interconnected and operating in parallel with the Company's electrical system. The rate rider includes the rates, terms and conditions for three services: Supplementary, Back-Up and Maintenance Power.[14]

A version of Rate Rider RGB has been on file with the Alabama PSC since early 1988. However, it was not until the changes proposed on December 20, 2012—the so-called "Revision Fifth"—that Alabama Power would begin assessing charges for back-up service against small customer generators taking service under the Company's standard residential tariff (Rate FD – "Family Dwelling"), alternative residential tariff (Rate RTA), standard school tariff (Rate SCH), and small commercial tariff (Rate LPS).[15] Pursuant to Back-up Power Part I.B of the Revision Fifth, the Company would, for the first time, assess a "Capacity Reservation Charge" of $5.00 per kW against these customers for back-up service.[16] The charges would apply based on the size of the customer's self-generation equipment. For example, a customer with a 5 kilowatt (kW) solar array would now owe the Company $25.00 per month for back-up service ($300 per year), in addition to fixed and variable energy charges imposed by Alabama Power on that customer.

Of the covered customer classes, only the Rate RTA customer could avoid the Capacity Reservation Charge, but only by opting to pay a 70¢ per kilowatt-hour (kWh) charge ("Alternative Rate RTA Charge") during the weekday hours of 3:00 to 5:00 p.m. of the summer season, June through September (summer peak hours).[17] Rate RTA is a

Special Rules Governing the Application of Rate Rider RGB (Docket No. 18126) (Dec. 20, 2012) [hereinafter 2012 Proposed Revisions].

[14] *See id.* at Rate Rider RGB Back-Up Power Part I.B (page 4 of exhibit).
[15] These rate tariffs are attached as Exhibits 5 through 8.
[16] *See* Ex. 4, 2012 Proposed Revisions at Rate Rider RGB Back-Up Power Part I.B (page 4 of exhibit).
[17] *Id.* at Rate Rider RGB Back-Up Power Part I.B.2.a (pages 4-5 of exhibit).

time varying rate that includes a demand charge; the Alternative Rate RTA charge is more than three times the otherwise applicable rate.[18]

The cover letter accompanying the Company's December 20, 2012 filing made no reference to the proposed new charges. Instead, the filing described the revisions merely as "updates" that would "clarify the applicability of the rate rider, while expanding the number of rate options that are eligible to take service under the rider."[19] In addition, the letter described the revisions as including "updated rate definitions and service options to reflect changes in technology and system costs."[20]

The Alabama PSC approved the revisions just three weeks later.[21] The Alabama PSC held no hearing and received no public testimony before approving the new charges, which its order made effective with May 2013 billings. Solar customers who had filed for interconnection prior to May 2013 were exempted from paying the new charges.[22]

While the charges nominally apply to any form of non-emergency customer-sited generation, they were developed based upon solar production data and the expectation that customer solar adoption was beginning to take root in Alabama.[23] As a preemptive strike against that nascent trend, the charges have proved devastatingly effective. When the Alabama PSC adopted the new charges in May 2013, there were just 79 customer accounts subject to Rate Rider RGB (and these customers have been exempted from the new charges).[24] As of November 2019, there were only approximately 132 customers

---

[18] Ex. 6, Rate RTA.
[19] Ex. 4, 2012 Proposed Revisions at 1.
[20] *Id.*
[21] Ex. 9, Order, Docket Nos. U-4226 & 18126 (Ala. P.S.C. Jan. 10, 2013); *see also* Ex. 1, 2013 Rate Rider RGB (submitting the updated rate sheet and special rules to the PSC following approval).
[22] Ex. 9, Order at 1 ("These revisions will not impact service to existing RGB customers.").
[23] *See* Ex. 10, Hr'g Tr. 20:2-5, 16:7-17:3, *Bankston, et al. v. Ala. Power Co.*, Docket Nos. 32767 & U-4226 (Ala. P.S.C. Nov. 21, 2019).
[24] *Id.* 20:2-5.

subject to the charges, representing a total combined capacity of just over 650 kilowatts (compared to a total system capacity for Alabama Power of approximately 13,000 megawatts).[25] With scarcely any customer-sited solar in its service territory, Alabama Power has, with the Alabama PSC's blessing, erected a significant barrier to solar deployment. As a result, Alabama significantly lags other states in customer solar adoption.

### B. **Petitioners file Complaint at the Alabama PSC.**

In April 2018, Petitioners filed a complaint with the Alabama PSC alleging that the charges assessed for back-up service were unfair, unreasonable, unjust, discriminatory, contrary to the public interest and otherwise unlawful.[26] Alabama Power responded by seeking to increase the Capacity Reservation Charge to $5.42/kW (later lowered to $5.41/kW due to an Alabama Power error) and the Alternative Rate RTA Energy Charge to 71¢/kWh.[27] The Company presented written direct testimony from its Regulatory Pricing Manager, Ms. Natalie Dean, who purported to justify the charges as necessary "to fully recover the fixed costs associated with providing Back-Up Power."[28] Petitioners timely amended their complaint to include challenges to the proposed

---

[25] *See id.* 20:2-5, 20:18-21:4, 21:19-22:10.

[26] Ex. 11, Complaint, *Bankston, et al. v. Ala. Power Co.*, Docket No. 32767 (Ala. P.S.C. Apr. 26, 2018).

[27] Ex. 12, Letter from Scott Grover, Balch & Bingham, to Walter Thomas, Secretary, Ala. P.S.C., Docket No. U-4226 (Ala. P.S.C. June 15, 2018) [hereinafter Dean Testimony]. The Company's filing included the direct testimony of Natalie Dean, Alabama Power's Regulatory Pricing Manager. Alabama Power later filed errata and substitutes to Ms. Dean's direct and reply testimony and exhibits. Those later corrected versions are attached hereto as Exhibits 12 and 15, respectively, and the two errata filings that include replacement figures for the direct testimony are attached hereto as Exhibit 13.

[28] Ex. 12, Dean Testimony 10:6-15. By "fixed costs," the Company meant "those related to the infrastructure needed to provide Firm Back-Up Power Service, including generation, transmission and distribution facilities that must be available to respond to the demands of customers with on-site generation . . . ." *Id.* 8:15-22.

increases in back-up service charges.[29] The parties thereafter engaged in limited discovery pursuant to a procedural ruling from the Alabama PSC.

## C. Alabama Power's attempt to justify the charges shows no basis in cost to serve.

Alabama Power's filings and subsequent discovery provided detail regarding its development of the charges. The Company developed and compared two "representative" customer profiles—one with solar and one without.[30] Solar was the predominant form of self-generation used by Alabama Power customers, and the one the Company viewed as most likely to continue to be adopted by residential customers.[31] The Company began by identifying current customers on the standard residential rate (Rate FD) who had installed solar.[32] The Company looked to those customers' usage *prior to* installing on-site generation, which yielded an indicative load profile for a representative Rate FD customer without solar.[33] The Company then used solar production data from the PVWATTS® tool to determine what this representative customer's load profile would look like after adopting on-site solar generation.[34] The Company reduced the representative Rate FD customer's load profile by the amount of solar production profile, thus yielding a representative solar customer. Finally, the Company assumed a 4.3 kW

---

[29] Ex. 14, First Am. Compl., *Bankston, et al. v. Ala. Power Co.*, Docket No. 32767 (Ala. P.S.C. July 6, 2018).

[30] Ex. 12, Dean Testimony 13:20-14:15, 15:7-11.

[31] Ex. 10, Hr'g Tr. 20:2-5.

[32] Ex. 12, Dean Testimony 14:20-15:22; Ex. 15, Dean Reply Testimony 10:21-11:1, *Bankston, et al. v. Ala. Power Co.*, Docket Nos. 32767 & U-4226 (Ala. P.S.C. Dec. 13, 2018).

[33] Ex. 15, Dean Reply Testimony 11:1-4.

[34] *Id*. 11:5-10. The PVWATTS® Calculator developed by the National Renewable Energy Laboratory (NREL) "[e]stimates the energy production and cost of energy of grid-connected photovoltaic (PV) energy systems throughout the world. It allows homeowners, small building owners, installers and manufacturers to easily develop estimates of the performance of potential PV installations." *PVWatts Calculator*, Nat'l Renewable Energy Laboratory, https://pvwatts.nrel.gov/ (last visited March 5, 2021).

solar installation size as representing the average residential solar installation in its service territory.[35]

The Company did not evaluate the actual metered net usage of existing Rate FD customers with solar. Had the Company done so, it could have determined what demands those customers place on the system and when.[36] The Company could also have determined how solar QFs' net usage, as a sub-class, compared to the usage patterns for the residential class as a whole. Having not made that comparison, the Company conceded that it did not know whether the actual net usage of its solar customers is within the range for the Rate FD class as a whole or is higher or lower than the average.[37]

Such a comparison is important because Rate FD is a volumetric energy rate— *i.e.*, its energy charge (in ¢/kWh) is designed to recoup both variable and fixed costs incurred by the Company in connection with the customer's usage.[38] As a class, residential customers exhibit fairly significant load diversity.[39] Rate FD is designed to recover the Company's fixed and variable costs with consideration of that load diversity.[40]

But even without evaluating actual net usage patterns, the Company's analysis demonstrated unequivocally that solar customers *cost less to serve* than customers without solar. Specifically, the representative solar customer is 2.53¢/kWh less costly to serve from a variable energy cost standpoint, which Alabama Power determined is a total of $136 per year based on the representative solar customer using 5,358 kWh less than a

---

[35] Ex. 12, Dean Testimony 18:6-13.
[36] Ex. 10, Hr'g Tr. 39:12–40:3.
[37] *Id.* 88:16-20.
[38] *Id.* 40:20–41:1.
[39] *Id.* 41:2-5.
[40] *Id.* 41:10-14.

non-solar customer.[41] From a fixed cost standpoint, the representative solar customer is $129/kW less costly to serve, or $554.70 based on the representative solar customer's 4.3 kW-sized system.[42]

Alabama Power argued the fixed cost savings were not real but would exist only if the solar customer never required back-up power.[43] But in a concession to PURPA requirements, the Company acknowledged that it could not base its rates for back-up service on the assumption that reductions in electric output by every on-site generator on its system would occur simultaneously, or during system peak, or both.[44] Therefore, for every 10 kW of on-site solar on its system, the Company did not need to hold 10 kW in reserve for back-up but could instead reserve "just" 6.5 kW, that is, a 35% credit. Thus, the Company gave solar QFs credit for just 35% of the $129/kW in fixed cost savings shown by its original comparison of the representative solar and non-solar customer profiles.[45] The application of this 35% credit (or 65% decrement) had the effect of lowering the fixed cost savings attributable to the solar customer, but in the Company's analysis the solar customer remained less costly to serve than the non-solar customer.

In developing the 35% adjustment, the Company claimed it considered several factors, including customer diversification, the expected annual utilization of the on-site generator and its incremental capacity equivalent.[46] However, the Company did not rely on any numerical representation of these factors; the 35% credit instead reflected its "informed judgment."[47] The 35% credit amounts to an assumption that customer solar

---

41 Ex. 12, Dean Testimony at Revised Ex. ND-6.
42 *Id.* 16:19-23.
43 *Id.* 17:3-5.
44 *Id.* 17:5-11; *see* 18 C.F.R. § 292.305(c)(1); FERC Order No. 69, 45 Fed. Reg. at 12,229.
45 Ex. 12, Dean Testimony 17:13-16, 19:1-2, Revised Ex. ND-6.
46 *Id.* 17:13-16.
47 Ex. 10, Hr'g Tr. 56:1-8.

systems simultaneously fail 65% of the time. At no point did Alabama Power produce data or analysis estimating the actual demand for backup power from customer generators.

Even after applying the 35% credit, the Company determined that the representative solar customer was $330 less costly to serve[48] than the representative customer without solar.[49]

**D. Lacking a cost-of-service basis, Alabama Power relies on lost revenues.**

Alabama Power's analysis should have stopped there, with the conclusion that no separate charges for back-up service could be justified on a cost-of-service basis. Instead, the Company turned its focus to lost revenues. The Company determined that the representative solar customer with a 4.3 kW array consumes 5,358 fewer kWh annually than the representative customer without solar.[50] This reduced consumption results in a revenue shortfall, which the Company misleadingly called a "cost recovery difference," of $609.[51] To this difference the Company credited the solar customer for the $330 in cost *savings* (both variable and fixed).[52] Accounting for those benefits yielded a hypothetical[53] annual net unrecovered balance $279, which divided system size (4.3 kW) and 12 months produced the Capacity Reservation Charge of $5.41 per kW.[54]

---

[48] The $330 in cost savings is the sum of the $136 in variable energy savings determined by the Company and 35% of the fixed cost savings (35% of $129/kW times 4.3 kW or $194) – *i.e.*, $136 + $194 = $330.

[49] Ex. 12, Dean Testimony 18:19-21, Revised Ex. ND-6; Ex. 13, Errata Filings.

[50] Ex. 10, Hr'g Tr. 73:15-19.

[51] Ex. 12, Dean Testimony 18:15-17, Revised Ex. ND-6.

[52] Ex. 10, Hr'g Tr. 74:3 – 75:23.

[53] *Id.* 76:5-17. It is important to recognize that the "lost revenues" used by Alabama Power as purported justification for the Capacity Reservation Charge are estimated only; are unrelated to any legal or regulatory obligation of customers to pay regardless of their level of usage; and are ultimately recovered only from customers who reduce their consumption through self-generation from on-site non-emergency generators, and not by other means.

[54] The Company developed its 71¢/kWh peak energy Alternative Rate RTA charge in a similar fashion, by assessing the difference in energy consumption (and hence cost recovery) between the solar and non-solar customer. The 71¢/kWh charge is what the Company determined was necessary to bring cost recovery

Having so determined the amount of the Capacity Reservation Charge using a "representative" Rate FD customer, Alabama Power then applied the same charge to three other rate schedules—Rate LPS (small commercial), Rate SCH (schools), and Rate RTA (residential time-varying).[55] As noted, of those three other rate classes, only the Rate RTA customer can avoid paying the charge, but only by agreeing to pay the 71¢/kWh peak energy Alternative Rate RTA charge during the summer peak hours.[56] Rate RTA customers are already on a time-varying rate with a demand charge; the Alternative Rate RTA assesses these customers an energy charge more than triple the otherwise applicable rate during the affected hours.[57]

### E. Alabama Power overcharges for supplementary service.

The evidence also revealed that Alabama Power makes no intelligible distinction between "supplementary" and "back-up" service, even though the Company charges differently for the two services. The contested charges are for back-up service. In contrast, for supplementary service under Rate Rider RGB, the customer pays the otherwise applicable rate, which under the Company's analysis is the Rate FD volumetric energy charge.[58] Hence, the solar customer on Rate FD pays for supplementary service the same way a non-solar customer on the same rate pays for general service, by the kilowatt-hour. The Company acknowledged it would be inappropriate to assess the back-up service charges for supplementary service.[59] Yet the Company nevertheless views

---

from the solar customer on Rate RTA back in line with that reaped from the non-solar customer. *See* Ex. 12, Dean Testimony 20:3-21:2, Revised Ex. ND-7.
[55] Ex. 12, Dean Testimony 13:20-14:3; Ex. 3, 2020 Rate Rider RGB at Back-Up Power Part I.B. (page 4 of exhibit).
[56] Ex. 3, 2020 Rate Rider RGB at Back-Up Power Part I.B.2.a. (pages 4-5 of exhibit); Ex. 12, Dean Testimony 10:16-11:2.
[57] Ex. 6, Rate RTA.
[58] *See* Ex. 3, 2020 Rate Rider RGB at Supplementary Power (page 3 of exhibit).
[59] Ex. 10, Hr'g Tr. 64:10-13.

back-up power service as covering *all* reductions in on-site generation, including those expected deviations in output already reflected in the PVWATTS® tool used to develop the representative solar profile.[60] By assessing back-up charges for supplementary service, the Company overcharges Petitioners and other similarly situated customers.

### F. Alabama PSC dismisses complaint and approves increases to charges.

On November 21, 2019, the Alabama PSC held a limited hearing in which the Company's sole witness was cross-examined and the opportunity was then provided to cross-examine Petitioners' sole witness. Following the hearing, the parties submitted proposed orders, and the Alabama PSC's Staff made its recommendation for action by the Commission. Staff recommended that the Alabama PSC grant Alabama Power's motion to dismiss Petitioners' complaint and approve the proposed increases to the charges for back-up service. On October 16, 2020, the Alabama PSC issued an Order giving effect to Staff's recommendation.[61]

### IV. How the Charges Impact Solar Customers

The Alabama Solar QFs are all Rate FD customers, as are most Alabama Power customers. Thus, they are required by Rate Rider RGB to pay the Capacity Reservation Charge of $5.41/kW applied to their system size. For example, a customer with a five kilowatt solar array must pay a monthly fee of $27.05. Over the thirty-year life of a typical solar installation, the charges add up to a considerable amount. In the example just cited, the customer would pay Alabama Power $324.60 per year, which translates to $9,738 over thirty years. The charge thus significantly erodes the customer's expected savings while lengthening the payback period of their investment.

---

[60] Ex. 15, Dean Reply Testimony 17:3-5.
[61] *See generally* Ex. 2, RGB Rider Order.

The Capacity Reservation Charge paid by the Alabama Solar QFs and others similarly situated applies on top of the other standard charges assessed under Rate FD. For example, Alabama Solar QFs pay the same base charge of $14.50 per month as other Rate FD customers.[62] In addition, for each kWh they consume from the grid as supplementary service, Alabama Solar QFs pay the same standard volumetric energy charge as non-solar customers—a charge that is designed to recoup the variable and fixed costs attributable to the Rate FD class.[63]

## V.     Argument

PURPA and FERC's implementing regulations prohibit utilities from charging discriminatory rates to QFs, including residences, schools, and small businesses with rooftop solar systems. Congress required FERC to adopt regulations necessary to encourage small power production, including regulations that ensure electric utilities sell energy to QFs at nondiscriminatory rates.[64] Congress deemed this protection necessary to prevent utilities from circumventing Congress's goal to increase small power production by charging unjust and non-cost-based rates that discourage self-generation.[65]

FERC's implementing regulations satisfy Congress's mandate by requiring that rates for electricity to QFs "[s]hall not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility."[66] The regulation then defines rates that are not discriminatory. Rates for QFs may differ only if they are "based on accurate data and consistent with systemwide costing principles" and do not differ from rates charged "to the utility's other customers with similar load or

---

[62] Ex. 10, Hr'g Tr. 18:14-16.
[63] Ex. 12, Dean Testimony 10:8-10.
[64] 16 U.S.C. § 824a-3(a)-(c).
[65] FERC Order No. 69, 45 Fed. Reg. at 12,228-29.
[66] 18 C.F.R. § 292.305(a)(1)(ii).

other cost-related characteristics."[67] In FERC Order No. 69, the Commission explained that the purpose of that rule is to require rates based on "traditional ratemaking (*i.e.*, cost of service) concepts" such that "a customer should be charged at a rate applicable to a non-generating [customer of the same class type] unless the electric utility shows that a different rate is justified on the basis of sufficient load or other cost-related data."[68] Thus, to develop separate rates for QFs, a utility must rely on systemwide costing principles to show that the rate "charged to a comparable customer without its own generation is not appropriate" and, thereafter, base any different rate for customer-generators "upon those data and principles."[69] A rate that is not based on actual and accurate data showing a difference, or that applies a different pricing policy to QFs, is prohibited.

The Alabama PSC failed to implement 18 C.F.R. § 292.305 when it adopted the revisions to Rate Rider RGB that imposed new and increased charges for "back-up service" to QFs. QFs in the residential class, in the small general service class, and schools must pay large fixed charges that non-QFs in those same classes do not pay for common demand costs. Those charges violate 18 C.F.R. § 292.305(a) for three distinct reasons. First, they are not based on accurate data showing a difference in cost to serve customers who have adopted on-site solar. Second, the charges are based on lost revenues rather than on cost-of-service principles. Third, the charges apply a different pricing policy to QFs than non-QFs with similar load patterns for collecting demand costs common to the rate class from customers. The Rate Rider RGB charges therefore discriminate against QFs "in comparison to rates for sales to other customers served by

---

[67] *Id.* § 292.305(a)(2).
[68] 45 Fed. Reg. at 12,228.
[69] *Id.*

the electric utility" without any justification based upon "accurate data and consistent systemwide costing principles."[70]

The charges also violate 18 C.F.R. § 292.305(b) because they assess charges for back-up services that Alabama Solar QFs did not request. FERC's regulations make clear that back-up service shall be provided "upon request of a qualifying facility," but not as a matter of course, and certainly not without the QF's consent. And because Alabama Power makes no meaningful distinction between back-up and supplementary service, the charges force solar customers to pay back-up service charges for what amounts to supplementary service—effectively double-charging them for the same service.

Finally, the charges violate 18 C.F.R. § 292.305(c) by relying upon unreasonable and unsupported assumptions regarding forced outages of customer-sited systems. The Company's assumption that solar QFs would experience simultaneous forced outages 65% of the time has no basis in fact.

A.  **Violations of 18 C.F.R. § 292.305(a).**

  1.  *The Rate Rider RGB Back-up Power charges are not based on accurate data showing a difference between solar and non-solar customers.*

In developing its charges for back-up service, Alabama Power did not perform a cost-of-service study specific to solar customers. The Company performed no cost-of-service study beyond the general study performed to allocate costs among all rate classes. For solar QFs, the Company performed only a "representative" cost-of-service study for the subset of the customer population it considered likely to interconnect on-site generation.[71]

---

[70] 18 C.F.R. § 292.305(a)(1)(ii) & (a)(2).
[71] Ex. 12, Dean Testimony 13:20-21.

The Company selected the Rate FD class because that is the rate under which most of its solar customers take service (it is also the rate structure used by most of the Company's 1.2 million customers).[72] The Company then evaluated the usage patterns of Rate FD customers with solar, but only their usage patterns *prior to* installing solar, not after.[73] The Company deemed this pre-solar usage profile indicative of a customer likely to adopt solar. This yielded the "representative" Rate FD customer *without* solar.[74] The Company did not evaluate the actual metered net usage of Rate FD customers after adopting solar. Instead, the Company simply assumed that the "representative solar customer" would—as a result of their system's expected production—annually consume 5,358 fewer kWh of utility-supplied electricity than the representative customer without solar.[75] As a result, the charges for back-up service have nothing to do with the actual usage patterns of solar customers, including their electricity demand during the peak hours that drive infrastructure costs. Without such data, the Company lacked any basis for comparing solar and non-solar customers' loads and costs and failed to demonstrate that different rates are appropriate for solar customers due to a difference in loads and costs between solar and non-solar customers.

Absent such data, the Company could not and did not assess the usage patterns of solar customers relative to the normal variation of usage for the Rate FD class as a whole. Without data showing that its solar customers have patterns of electric usage outside of the range of other customers, Alabama Power could not and did not show that solar customers have a categorically different cost of service justifying different rate treatment.

---

[72] *Id.* 14:3-4, 15:7-11; Ex. 10, Hr'g Tr. 14:2-8.
[73] Ex. 15, Dean Reply Testimony 11:1-3.
[74] Ex. 12, Dean Testimony 14:21-15:6; Ex. 15, Dean Reply Testimony 11:1-5.
[75] Ex. 12, Dean Testimony at Revised Ex. ND-6.

In fact, the Company admitted it does not know whether the actual net usage of its solar customers is within the average for the Rate FD class as a whole or is higher or lower than the average.[76]

Finally, the Company elected to base the Capacity Reservation Charge on the size of a customer's solar system despite the lack of any correlation between system size and the customer's usage of utility-supplied electricity during system peak. Thus, the charge does not vary with the level or pattern of the customer's usage, nor is it impacted by the extent to which the customer, by self-generating, may reduce demand during system peak hours.

Given these deficiencies, the Alabama PSC's approval of the Rate Rider RGB charges for back-up service constitutes a failure to implement 18 C.F.R. § 292.305(a).

> 2. *A back-up power rate calculated based upon lost revenues does not meet PURPA requirements for cost-of-service rates.*

Even if the Company's "representative customer" analysis could legitimately substitute for a cost-of-service study specific to solar customers, it failed to supply a cost-based justification for the charges. The Company's analysis instead demonstrated unequivocally that solar customers are *less costly* to serve than customers without solar. Specifically, the Company found that the representative solar customer is $330 less costly to serve annually than the non-solar customer, a figure that includes both the variable and fixed cost *savings* attributable to solar adoption.[77]

Lacking any cost-of-service basis, the Rate Rider RGB charges derive ultimately from projected lost revenues. The charges are based on the assumed under-collection of demand costs from customers with solar. The Company assumed that the "representative"

---

[76] Ex. 10, Hr'g Tr. 88:16-20.
[77] *Id.* 76:1-4; Ex. 12, Dean Testimony 18:19-21.

solar customer with a 4.3 kW array will buy 5,358 fewer kWhs annually—totaling $609—than the customer without solar.[78] This reduced electricity consumption (and resulting revenue to the Company) was the true starting point for the Company's development of the charge. To this sum—a "cost recovery difference" of $609— Alabama Power credited the energy and demand *savings* attributable to solar generation ($330) in order to reach an "annual net unrecovered balance" of $279. That sum, when divided by system size (4.3 kW) and 12 months, produced a Capacity Reservation Charge of $5.41 per kW.[79]

Thus, the charges are based purely on cost recovery *decrease* the Company believes solar adoption will cause, not from any cost of service *increase* for providing back-up power during unscheduled outages of solar equipment. Indeed, the Company adopted the charges even though it has no information that solar customers were driving any specific infrastructure costs relating to interconnection and reliable operation of the grid.[80] The Company concedes it has not had to incur any additional capacity costs specifically as a result of the extremely limited solar penetration in its service territory.[81]

In promulgating its PURPA regulations, the Commission was clear that it "contemplates formulation of rates [for sales to QFs] on the basis of traditional ratemaking (*i.e.*, cost-of-service) concepts."[82] Lost revenues are not cost of service. For the residential class to which Rate FD is applicable, the Company designed electric rates

---

[78] Ex. 10, Hr'g Tr. 73:15-74:2; Ex. 12, Dean Testimony 18:15-19:1, Revised Ex. ND-6; Ex. 13, Errata Filings.
[79] *See* Ex. 12, Dean Testimony at Revised Ex. ND-6.
[80] Ex. 10, Hr'g Tr. 25:7-12.
[81] *Id.* 25:16-19. A further indication that the charges have no legitimate cost-of-service basis is shown by Alabama Power's willingness to grandfather all solar customers who had interconnected prior to May 2013, the effective date of the new charges. Were such customers truly imposing new costs on the system, Alabama Power would be seeking to recover those costs.
[82] FERC Order No. 69, 45 Fed. Reg. at 12,228.

to collect the class's demand-related costs based on the amount of kWh each customer uses each month. Specifically, for the residential class, Alabama Power primarily collects demand-related costs through a ¢/kWh charge for each kilowatt-hour residential customers use.[83] Thus, residential customers pay for whatever demand-related costs they impose based only on how much electricity they use during the month. This approach comports with traditional rate making. Solar customers on Rate FD pay such costs through every kWh of "supplementary service" they consume—*i.e.*, the electric service they regularly require "in addition to" what their solar systems generate.[84]

Under such a rate design, the Company has no entitlement to any particular level of usage (and resulting revenue) from any residential customer. Residential customers as a class exhibit load diversity, and while the Company bases its rates on projections of usage, that does not mean it must be made whole if and when its projections fail to materialize. Customers may lower their consumption of utility-supplied electricity in myriad ways, only one of which is to make a sizeable private investment in on-site solar. For instance, the Company conceded it could not bill a family for lost revenues from reduced usage when their children leave home for college; nor could the Company charge that customer for holding capacity in reserve for when the children return home in the summer and usage patterns resume to prior levels.[85]

But the Company made exactly those sorts of illegitimate assumptions regarding solar customers by assuming an entitlement to more than 5,000 kWh of annual sales avoided by the "representative" customer's solar investment. For the Company to single out customer generators for special charges, when the "cost recovery difference" revealed

---

[83] *See* Ex. 12, Dean Testimony 10:6-10.
[84] *See* 18 C.F.R. § 292.101(8) (defining "supplementary power").
[85] Ex. 10, Hr'g Tr. 80:23-81:16.

by its analysis can result from a multitude of other circumstances, is to unjustly discriminate against solar customers. And the Company's reliance on lost revenues is especially problematic when its analysis otherwise demonstrated that solar customers are *less costly* to serve in terms of both variable and fixed costs. Because the evidence firmly established that the charges have their basis in lost revenues, and not in cost to serve, and because reduced customer usage is not unique to solar customers, the Alabama PSC-approved charges are unlawful and discriminatory under PURPA.

3. *The back-up power charges are discriminatory because they are not based on consistent systemwide costing principles as applied to other customers with similar load characteristics.*

Rate Rider RGB charges solar customers more for the same level of service as non-solar customers. The Rider's back-up charges collect class demand costs common to QFs and non-QFs differently, based on different pricing policies. A solar QF on Rate FD pays for class demand costs twice: once through the Capacity Reservation Charge under Rate Rider RGB, and again through every kWh purchased under Rate FD's volumetric energy rate, which applies to their "supplementary service" needs. Meanwhile, non-QFs under Rate FD pay for class demand costs based solely on their volumetric energy usage. Hence, while all residential customers on Rate FD—with or without solar—pay the same rate for each kWh of electricity from the utility,[86] and the same basic customer service charge,[87] only solar customers must pay an additional charge for "back-up service."

---

[86] Rate FD assesses a charge of 10.6618¢/kWh for the first 1000 kWh in the months of June through September and for the first 750 kWh in the remaining months of the year. For the summer months, the charge is 10.9147¢/kWh for all consumption over 1000 kWh; for the remaining months, the charge is 9.4618¢/kWh for all consumption over 750 kWh. Ex. 5, Rate FD.
[87] *Id.* Rate FD assesses a base charge of $14.50 per month per customer.

To illustrate, a non-solar customer on Rate FD who purchases 500 kWh of electricity in a month pays $53.31[88] in kWh charges and the $14.50 base charge, for a total bill of approximately $67.81.[89] In contrast, a solar customer with a 5 kW solar array who also purchases 500 kWh of electricity from Alabama Power pays the same $53.31 in kWh charges, and the same $14.50 base customer charge, and must also pay a $27.05 monthly charge for back-up service, for a total bill of $94.86, which is 40% higher for the same amount of electricity in the same month solely because the customer has solar generation.[90] The solar customer must pay that much more than an equivalent non-solar consumer despite the Company's own analysis showing the solar customer is less costly to serve. Further, the solar customer must pay the additional monthly charge even if the patterns of use for both customers are exactly the same.

Pursuant to 18 C.F.R. § 292.305, even if a different rate for QFs could be justified based on accurate data, it must still be based on the "consistent systemwide costing principles." A charge may not single out QFs for different treatment if non-QFs in the same class have "similar load or other cost-related characteristics."[91] The Alabama PSC violated these requirements by approving the Company's different pricing policy for QFs.

### B. Rate Rider RGB violates 18 C.F.R. § 292.305(b) by forcing back-up service on customers who did not request it.

None of the Alabama Solar QFs requested back-up power service from Alabama Power. Instead, they simply sought interconnection, at which point they became subject

---

[88] 500 kilowatt-hours multiplied by 10.6618¢/kWh = $53.31.
[89] *See* Ex. 5, Rate FD.
[90] This analysis is simplified in that both customers in the example would be responsible for other charges, such as fuel costs and environmental compliance costs assessed under different riders. In addition, the solar customer may receive a nominal payment between $0.0237 and $0.035/kWh for any excess electricity that it sells to Alabama Power under Rate PAE. But the overall point remains: the customer with solar pays more than the same level of usage because of the Capacity Reservation Charge.
[91] 18 C.F.R. § 292.305(a)(2).

to Rate Rider RGB and its monthly charge for "back-up" power service. For the times when their system does not generate electricity as anticipated (*e.g.*, at night), they expect and are charged for supplementary service at the consumption rate otherwise applicable to customers in their class.

The Commission's PURPA regulations provide that back-up service is something to be provided upon request of the QF, not something foisted upon them as an additional cost of interconnecting their system.[92] Unlike a cogeneration facility, a customer's solar array is unlikely to experience forced outages necessitating a separate arrangement with the utility to hold equivalent capacity in reserve. In the rare event in which a customer's solar array is unexpectedly inoperable, the customer resumes status as a full requirements customer, paying fully for the variable and fixed system costs occasioned by their usage through each kWh they consume from the grid.

To be sure, solar customers require supplementary power—defined as energy or capacity that a customer uses "in addition to" that which the customer generates on their own.[93] Alabama Power agrees that interconnected customers with solar are unlikely to be able to meet all of their needs through self-generation.[94] A customer's solar installation will rarely produce up to its nameplate capacity, will produce less or not at all when it's cloudy, and will not produce at night.[95] In those instances, the customer takes supplementary service from the Company at the full retail rate.[96] For the Rate FD

---

[92] *See* 18 C.F.R. § 292.305(b)(1) (back-up power to be provided "[u]pon request of a qualifying facility").
[93] Ex. 10, Hr'g Tr. 60:1-6.
[94] *Id.* 60:22-61:12.
[95] *Id.* 61:13-62:8.
[96] *Id.* 62:13-63:4.

customer that means paying a volumetric charge that is designed to cover both the variable and fixed costs associated with their usage.[97]

Back-up power serves a different function. It is designed to replace what the customer would ordinarily generate during an unscheduled outage of the customer's facility.[98] Alabama Power has nevertheless made clear that it views back-up power service as covering *all* reductions in on-site generation, including "unscheduled" outages associated with the absence of sunlight.[99] But such a sweeping conception of back-up service would include expected deviations in system output, which are the province of supplementary service, and which the Company already accounted for through its use of the PVWATTS® tool to develop the "representative" solar customer profile.[100]

Alabama Power acknowledges that it would be inappropriate to assess back-up service charges for supplementary service.[101] But the Company's failure to make a clear analytical distinction between the two services means the Company is over-charging solar customers for supplementary service. Petitioners should not have to pay for a service they did not request (and rarely, if ever, need) when the effect is to over-charge them for a service they do need—supplementary service.

C. **The Rate Rider RGB charges for back-up service violate 18 C.F.R. § 292.305(c) by relying on unsupported assumptions regarding forced outages.**

The Commission's PURPA regulations contain a specific provision covering rates for sales of back-up and maintenance power. Section 292.305(c) provides that rates for back-up power service "shall not be based upon an assumption (unless supported by

---

[97] *Id.* 63:11-13.
[98] *See* 18 C.F.R. § 292.101(9) (defining "Back-up power").
[99] Ex. 15, Dean Reply Testimony 17:3-5.
[100] *See* Ex. 12, Dean Testimony 15:11-18.
[101] Ex. 10, Hr'g Tr. 64:10-13.

factual data) that forced outages or other reductions in electric output by all qualifying facilities on an electric utility's system will occur simultaneously, or during the system peak, or both."[102] In its discussion of this provision, the Commission noted that QFs exhibit diversity in size and load requirements. As a result, "an electric utility supplying back-up or maintenance power to qualifying facilities will not have to plan for reserve capacity to serve such facilities on the assumption that every facility will use power at the same moment."[103] The Commission believed that "probabilistic analyses of the demand of qualifying facilities will show that a utility will probably not need to reserve capacity on a one-to-one basis to meet back-up requirements."[104] The Commission also made clear that a utility seeking to refute that assumption must do so on the basis of "factual data," which need not necessarily be "empirical load data," but must nevertheless be data.[105]

In supposed deference to this requirement, Alabama Power assumed that solar QFs across its service territory experience simultaneous forced outages 65% of the time.[106] As a result, solar customers would receive credit for only 35% of the demand savings otherwise attributable to solar deployment.[107] The effect of this assumption is that for every 10 kW of solar on the system, the Company asserts it must hold 6.5 kW in reserve to cover simultaneous forced outages of solar equipment. The Company provided no support for that assumption. The Company says it considered several factors, such as customer diversification and expected utilization of the customer's system, but admits it

---

[102] 18 C.F.R. § 292.305(c).
[103] 45 Fed. Reg. at 12,229.
[104] *Id.*
[105] *Id.*
[106] *See* Ex. 12, Dean Testimony 17:1-16.
[107] *Id.*

did not rely on any numerical representation of those factors.[108] Instead, the Company relied on its "informed judgment,"[109] which cannot substitute for the data-driven probabilistic analysis of demand required by Section 292.305(c) of the Commission's PURPA regulations.[110]

To be clear, whether the Company's 35% "diversity" credit has sufficient empirical support is an issue of secondary importance. Even accepting the Company's assumption that customer solar systems experience simultaneous forced outages 65% of the time, the fact remains that solar customers produce capacity savings relative to non-solar customers within the same rate class. The Company admitted that for every 10 kW of customer-sited solar, 3.5 kW of system capacity becomes available for use by other customers.[111] In contrast, for a non-solar customer with a peak demand of 10 kW, the Company asserted that it must be prepared to meet that 10 kW of demand at any time, including during system peak.[112] Solar customers are less costly to serve because they allow the Company to hold less capacity in reserve to serve those customers' needs. Because the Company's own evidence shows that solar customers are less costly to serve than non-solar customers in the same class, there is no cost-of-service justification for charging them more than other customers. While a more reasonable assumption regarding simultaneous forced outages would result in a lower charge for back-up service, the

---

[108] *Id.* 17:13-16.
[109] Ex. 10, Hr'g Tr. 56:1-8.
[110] The Company also pointed to a 2015 study of distributed solar performance data in Alabama by the Electric Power Research Institute ("EPRI"). Ex. 15, Dean Reply Testimony 18:11-18, Ex. ND Reply-7. But that study did not examine the phenomenon for which back-up service is required—*i.e.*, the frequency with which solar systems experience simultaneous forced outages. Alabama Power made no showing that weather-driven simultaneous reductions in solar output across geographically dispersed systems were not the same expected deviations in output already captured in solar performance projection tools like PVWATTS®. Thus, here again, the Company made no showing of a need for back-up as opposed to supplementary service.
[111] Ex. 10, Hr'g Tr. 30:8-13.
[112] Ex. 15, Dean Reply Testimony 9:17-10:2.

reality is that the Company has not shown that *any* separate charge for back-up service is justified.

Nevertheless, Petitioners urge the Commission to clarify that any attempt by Alabama Power to assess a back-up service charge against solar QFs must be grounded in real-world data regarding simultaneous forced outages of customer-sited solar systems. In addition, the utility should also be prepared to show that existing demand-cost recovery mechanisms—such as Rate FD's volumetric energy charge—are insufficient to recover the demand costs imposed by those customers. Here, because the evidence unequivocally demonstrates that solar QFs are less costly to serve than their non-solar peers, the charges for back-up service are unlawful under PURPA. The Commission should therefore direct the Alabama PSC to reject the charges and properly implement PURPA's rates for sales provisions.

## VI. Requested Remedy

For the foregoing reasons, Petitioners respectfully urge the Commission to initiate an enforcement action against the Alabama PSC compelling it to properly implement the Commission's PURPA regulations requiring the sale of electricity to solar QFs in Alabama at just, reasonable and non-discriminatory rates. The Commission should take such action because the charges for back-up service assessed by Alabama Power through its Rate Rider RGB are stifling and discouraging solar QF development contrary to PURPA.

Should the Commission elect not to pursue its own enforcement action, Petitioners alternatively request that the Commission enter the following findings and such additional findings as it believes would establish a legally sufficient predicate for

Petitioners to initiate an enforcement action and for a court summarily to hold that the Alabama PSC's approval of the Rate Rider RGB charges for back-up service violated the Section 292.305(a), (b), and (c) of the Commission's regulations. To this end, Petitioners request that the Commission find and declare that the Alabama PSC has violated PURPA and the Commission's regulations in approving the Rate Rider RGB charges for back-up service violate PURPA because:

(1) The charges are not based on a cost-of-service study of solar QFs or other accurate data showing that those customers cost more to serve than non-solar customers in the same class;

(2) The charges are based on lost revenues resulting from reduced customer usage, which is not unique to solar adoption, making it *per se* discriminatory to single out QFs for differential treatment;

(3) The charges are not based on consistent systemwide costing principles because they apply a different pricing policy to solar customers, charging them more for the same level of service than non-solar customers;

(4) Back-up service may not be unilaterally imposed upon a QF that does not request it, especially when such action results in overcharging them for supplemental service; and

(5) The charges rely on unreasonable and unsupported assumptions regarding the frequency of simultaneous forced system outages of customer-sited solar equipment.

## VII.    Conclusion

For the foregoing reasons, James H. Bankston, Jr., Ralph B. Pfeiffer, Jr., Mark Johnston, Teresa K. Thorne and GASP, Inc. respectfully request that the Commission

grant this petition and initiate an enforcement action against the Alabama PSC to remedy the PURPA violations discussed herein. In the alternative, Petitioners respectfully request that the Commission provide the findings requested in Section VI above.

Respectfully submitted,

/s/ Kurt D. Ebersbach
Kurt D. Ebersbach
Southern Environmental Law Center
Ten 10th Street NW, Suite 1050
Atlanta, GA 30309
Tel:	(404) 521-9900
Fax:	(404) 521-9909
Email: kebersbach@selcga.org

Keith A. Johnston
Christina A. Tidwell
Southern Environmental Law Center
2829 2nd Avenue South, Suite 282
Birmingham, Alabama 35205
Tel:	(205) 745-3060
Fax:	(205) 745-3064
Email: ctidwell@selcal.org
	kjohnston@selcal.org

*Attorneys for Petitioners GASP, Inc., Mark Johnston and Teresa K. Thorne*

/s/ Clay Ragsdale
Clay Ragsdale
Allison Riley
Ragsdale LLC
517 Beacon Parkway W.
Birmingham, AL 35209
Tel:	(888)727-1087
Email: clay@ragsdalellc.com
	allison@ragsdalellc.com

*Attorneys for Petitioners James H. Bankston, Jr. and Ralph B. Pfeiffer, Jr.*

Dated: March 31, 2021

# EXHIBIT B

175 FERC ¶ 61,181
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Richard Glick, Chairman;
Neil Chatterjee, James P. Danly,
Allison Clements, and Mark C. Christie.

| | |
|---|---|
| James H. Bankston, Jr. | Docket No. EL21-64-000 |
| Ralph B. Pfeiffer, Jr. | |
| Mark Johnston, | |
| Teresa K. Thorne, | |
| GASP, Inc. | |
| v. | |
| Alabama Public Service Commission | |

NOTICE OF INTENT NOT TO ACT

(Issued June 1, 2021)

1.      On March 31, 2021, James H. Bankston, Jr., Ralph B. Pfeiffer, Jr., Mark Johnston, Teresa K. Thorne, and GASP, Inc., (collectively, Petitioners) filed a petition for enforcement against the Alabama Public Service Commission (Alabama Commission) pursuant to section 210(h)(2)(B) of the Public Utility Regulatory Policies Act of 1978 (PURPA).[1]  Petitioners claim that the Alabama Commission's approval of Alabama Power Company's Rate Rider RGB constitutes a failure to properly implement PURPA because Rate Rider RGB establishes rates for back-up services that discriminate against qualifying facilities.

2.      Notice is hereby given that the Commission declines to initiate an enforcement action pursuant to section 210(h)(2)(A) of PURPA.  Our decision not to initiate an

---

[1] 16 U.S.C. § 824a-3(h)(2)(B).

enforcement action means that Petitioners may themselves bring an enforcement action against the Alabama Commission in the appropriate court.[2]

By the Commission.  Chairman Glick and Commissioner Clements are concurring with a joint separate statement to be issued at a later date.

( S E A L )

Kimberly D. Bose,
Secretary.

---

[2] *Id.*

# EXHIBIT C

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

James H. Bankston, Jr.                                    Docket No. EL21-64-000
Ralph B. Pfeiffer, Jr.
Mark Johnston,
Teresa K. Thorne,
GASP, Inc.
  v.
Alabama Public Service Commission

(Issued June 2, 2021)

     Attached is the joint statement by Chairman Glick and Commissioner Clements concurring to an order issued on June 1, 2021, in the above referenced proceeding. *James H. Bankston, Jr., et al., v. Alabama Public Service Commission*, 175 FERC ¶ 61,181 (2021).

Kimberly D. Bose,
Secretary.

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

James H. Bankston, Jr.                              Docket No.     EL21-64-000
Ralph B. Pfeiffer, Jr.
Mark Johnston,
Teresa K. Thorne,
GASP, Inc.
  v.
Alabama Public Service Commission


(Issued June 2, 2021)


GLICK, Chairman, CLEMENTS, Commissioner, *concurring*

1.  We agree with the determination of the Commission not to bring an enforcement
action.  We concur to express our concern that the Alabama Public Service Commission
may be violating the Commission's PURPA regulations, undermining the statute's
purpose of encouraging Qualifying Facilities.[1]

2.  Petitioners have presented a strong case that the Alabama Commission failed to
adhere to the regulations set forth in FERC Order No. 69, violating the requirements of
PURPA Section 210.  Section 210(c) of PURPA requires that the rates for utility sales to
qualifying facilities (QFs) be "just and reasonable and in the public interest" and "not
discriminate" against QFs.[2]  Order No. 69 implements these requirements.  In Order No.
69, the Commission recognized that partial requirements QFs are "likely to have the same
characteristics as the load of other nongenerating customers of the utility," in which case
"the appropriate rate for sales to such a facility is the rate that would be charged to a
comparable customer."[3]  To charge a different rate consistent with Order No. 69, the rate

---

[1] *See* 16 U.S.C. § 824a-3(a) (authorizing the Commission to promulgate "such
rules as it determines necessary to encourage [qualifying facilities]"); *American Paper
Institute v. American Electric Power Service Corp.*, 461 U.S. 402, 404 (1983) ("Section
210 of the Public Utility Regulatory Policies Act of 1978 (PURPA) was designed to
encourage the development of cogeneration and small power production facilities and to
reduce the demand for fossil fuels.").

[2] 16 U.S.C. § 824a–3(c).

[3] *Small Power Production and Cogeneration Facilities; Regulations Implementing
Section 210 of the Public Utility Regulatory Policies Act of 1978*, Order No. 69, FERC
Stats. & Regs. ¶ 30,128, at 30,888, *order on reh'g sub nom.* Order No. 69-A, FERC Stats.
& Regs. ¶ 30,160 (1980), *aff'd in part & vacated in part sub nom. Am. Elec. Power Serv.*

must (1) be "based on accurate data"; (2) be established using "consistent system wide costing principles"; and (3) "apply to the utility's other customers with similar load or other cost-related characteristics."[4]   While a demonstration that the Alabama Commission had violated any single prong of these rules in establishing Rate Rider RBG Tariff would be enough to show that it failed to adhere to Order No. 69, Petitioners present arguments that none of these prongs may have been met.

3.   Most significantly, Petitioners argue that Alabama Power did not apply the Rate Rider RBG, or back-up service charge, to its "other customers with similar load or other cost-related characteristics."[5]   The Alabama Commission and Alabama Power justify the charge as non-discriminatory because a QF customer, as compared to a customer without on-site generation, may have lower volumetric usage but comparable peak usage that requires Alabama Power to have an adequate power supply ready for peak times.[6] However, neither sufficiently demonstrates that QF customer load profiles are in fact different from those of customers without on-site generation (who are not required to pay the Rate Rider RBG charge).[7]   If QF customer usage patterns are comparable to those of customers without on-site generation who reduce volumetric consumption through other means,[8] the current application of the Rate Rider RBG charge may be discriminatory.

4.   Petitioners also raise significant questions regarding the accuracy of the data used in formulating Rate Rider RBG, and whether it was based on a method that complies with cost of service principles.  Petitioners explain that Alabama Power justified its charges using a methodology that combined apples and oranges.[9]   Alabama Power developed and assessed the Rate Rider RBG for QF customers with on-site generation based on a difference in customer usage profiles before and after the installation of a theoretical solar array.  Specifically, Alabama Power assessed customers' usage profiles prior to

installing solar arrays by looking at actual customer usage data, but assessed customer usage after installation by looking to a generic projection of solar production rather than

---

*Corp. v. FERC*, 675 F.2d 1226 (D.C. Cir. 1982), *rev'd in part sub nom. Am. Paper Inst. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402 (1983).

[4] 18 C.F.R. § 292.305(a)(2).

[5] Petition at 24-25.

[6] *See* Alabama Commission Protest and Answer at 14; Motion to Intervene and Protest of Alabama Power Co. at 11-12, 15.

[7] *See* Petition at 24.

[8] *Id.*

[9] *Id.* at 11-12, 20.

metered usage data.[10]  Alabama Power contends that Order No. 69 does not require a utility to collect actual metered usage from QFs to design a back-up charge, pointing out that the Order provides states with "great latitude in determining the manner of implementation of the Commission's rules."[11]  But while Order No. 69 provides flexibility for a variety of approaches given the different regulatory contexts across states and non-regulated utilities, it makes clear that "the manner chosen" must be "reasonably designed to implement" PURPA's requirement that avoided cost rates be just and reasonable and non-discriminatory.[12]  No reasonable explanation has been offered by Alabama Power or the Alabama Commission for the lack of consistency in measurement techniques before and after solar installation by a customer.[13]

For these reasons, we concur.

_____          _____
Richard Glick                             Allison Clements
Chairman                                  Commissioner

---

[10] Alabama Commission Protest at 6-7; *see* Petition at 20.

[11] Motion to Intervene and Protest of Alabama Power Co. at 14 (quoting Order No. 69, FERC Stats. & Regs. ¶ 30,128 at 30,892).

[12] Order No. 69, FERC Stats. & Regs. ¶ 30,128 at 30,892.

[13] The Alabama Commission appears to contend that the projection was necessary to isolate the amount of production from the solar array (given that the meter data readily available to Alabama Power measured only Alabama Power's service to customers and not the amount self-served via solar production). Alabama Commission Protest at 15-16. But the cost of *serving* customers depended not on solar production but rather on the amount of load served by Alabama Power.  Thus, Alabama Power's own metered usage data was the relevant measurement point both before and after solar installation.

Document Content(s)

EL21-64-000 Statement.DOCX...............................................1