**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION**

JAMES H. BANKSTON, JR., et al.,     ]

                                ]

    Plaintiffs,                 ]

                                ]

v.                             ]          **2:21-cv-469-ACA-SMD**

                                ]

ALABAMA PUBLIC SERVICE     ]
COMMISSION, et al.,           ]

                                ]

    Defendants.              ]

## MEMORANDUM OPINION

Plaintiffs James Bankston, Jr., Ralph Pfeiffer, Jr., Mark Johnston, Teresa Thorne, and members of GASP, Inc. installed solar units on their properties in part to reduce their electric bills from Intervenor-Defendant Alabama Power Company. But Alabama Power—with the approval of Defendant Alabama Public Service Commission—keeps a certain amount of electric energy ready for use by solar customers at any time. It calls this energy capacity "back-up power" and charges customers who generate some of their own electricity a "capacity reservation charge." Believing the charge to violate regulations under the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. §§ 824a-3(a), (c), the plaintiffs filed this action against the Public Service Commission and its

commissioners, Jeffrey Oden, Chris Beeker III, and Cynthia Almond (collectively "the Public Service Commission").

In total, the plaintiffs assert three causes of action. First, they contend that the Public Service Commission failed to implement 18 C.F.R. § 292.305(a) because the capacity reservation charge discriminates against solar customers ("Count One"). Second, the plaintiffs assert that the Public Service Commission failed to implement § 292.305(b) because it approved a rate that requires solar customers to accept back-up power service even when they have not requested it ("Count Two"). And third, they allege the Public Service Commission failed to implement § 292.305(c) because it approved the capacity reservation charge based on assumptions instead of factual data ("Count Three").

All three parties move for summary judgment. The court **WILL GRANT** the Public Service Commission's and Alabama Power's motions and **WILL ENTER SUMMARY JUDGMENT** in their favor. (Docs. 140, 141). The court **WILL DENY** the plaintiffs' motion for summary judgment. (Doc. 143).

## I.   BACKGROUND

On cross-motions for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1239 (11th Cir. 2018) (quotation marks omitted). Although the parties in this case purport to

2

dispute various facts, they rely on the same evidence and dispute only the legal conclusions that flow from that evidence. (*See* doc. 156 at 7–13; doc. 157 at 8–13; doc. 158 at 22–30); *see also* Fed. R. Civ. P. 56 ("The court need consider only the cited materials . . . ."). The following description of the undisputed facts therefore applies to all three motions for summary judgment.

The Public Service Commission regulates utility rates and services provided by Alabama Power. (Doc. 116 ¶ 19; doc. 117 ¶ 19; doc. 118 ¶ 19). Accordingly, Alabama Power submits rate proposals to the Public Service Commission for its approval. (*See* doc. 116 ¶ 28; doc. 117 ¶ 28; doc. 118 ¶ 28). Alabama Power's proposed rates are not effective until the Public Service Commission approves them. (*See* doc. 116 ¶¶ 19, 45; doc. 117 ¶¶ 19, 45; doc. 118 ¶¶ 19, 45).

In Alabama, most residential customers who get all their electricity from Alabama Power pay for that electricity under "Rate FD."[1] (Doc. 116 ¶ 39; doc. 117 ¶ 39; doc. 118 ¶ 39; *see* doc. 146-6 at 53–54). Rate FD charges a base monthly rate plus a price for the energy used. (Doc. 146-4 at 53). But some customers—including the individual plaintiffs in this case—generate part of their electricity some other way, such as by installing solar units. (Doc. 146-1 at 3; doc. 146-2 at 3; doc. 146-3

---

[1] Residential customers may opt into an alternative rate called "Rate RTA," which charges the same base monthly rate as Rate FD but calculates the price for energy used differently. (Doc. 149 at 6 ¶ 11; doc. 156 at 6 (not disputing paragraph 11); doc. 157 at 8 ¶ 11 (disputing a different part of paragraph 11); *see* doc. 146-5 at 2–4). Customers who generate some of their own energy may opt for Rate RTA but they are still subject to a charge for back-up power. (*See* doc. 145-4 at 217–18). The distinctions between Rate FD and Rate RTA do not affect the analysis in this case.

at 3–4; doc. 146-4 at 3; *see, e.g.*, doc. 146-1 at 3). However, each individual plaintiff requires "electricity in addition to what their equipment generates to meet their needs (e.g., at night or when cloudy) and sought such service by remaining customers of" Alabama Power. (Doc. 149 at 21 ¶ 74; doc. 156 at 13 ¶ 74; doc. 157 at 13). Those customers remain on Rate FD but are also subject to "Rate Rider RGB." (Doc. 146-1 at 18; doc. 146-2 at 7–8; doc. 146-3 at 10–11; doc. 146-4 at 7–8; *see* doc. 145-4 at 229–34). Of relevance to this lawsuit, Rate Rider RGB sets out the rates for "supplementary power" and "back-up power." (Doc. 145-4 at 229).

Rate Rider RGB defines supplementary power as "electric energy or capacity regularly used at the premises by a customer in addition to the energy that is ordinarily generated by a customer's own generation equipment." (*Id.*). So a residential customer who generates some of her own electricity but also uses any electricity generated by Alabama Power pays the Rate FD rates for the electricity purchased from Alabama Power. (*See id.* at 230).

Until 2012, Rate Rider RBG defined back-up power as "electric energy available to replace energy used at the premises and ordinarily generated by a customer's own generation equipment during an unscheduled outage." (Doc. 144-3 at 77–78). At that time, Alabama Power provided back-up power only to residential customers who specifically requested it. (*See id.*).

4

In 2013, the Alabama Public Service Commission approved amendments to Rate Rider RGB. (Doc. 149 ¶ 8; doc. 156 at 6; doc. 157 at 8; doc. 145-5 at 15). The current version of Rate Rider RGB defines back-up power as "electric energy or capacity intended to be available to the Customer at all times." (Doc. 145-4 at 229). Like the older version of Rate Rider RGB, it "is available only during unscheduled outages," but the current version continues that "unscheduled outages . . . can occur when a customer's own generation equipment is not producing energy or capacity, or is experiencing periods of intermittent generation." (*Id.*). Alabama Power bases how much energy it must keep available for each customer on the maximum capacity of electricity the customer can generate. (*Id.* at 231). Alabama Power now requires all residential customers who generate some of their own electricity to pay a "capacity reservation charge" to keep back-up power available to them. (*Id.*). The individual plaintiffs pay a capacity reservation charge of between $9 and $32.46 per month. (Doc. 146-1 at 7; doc. 146-2 at 3; 146-3 at 4–5; doc. 146-4 at 3).

After the plaintiffs filed an administrative complaint with the Public Service Commission challenging the capacity reservation charge as discriminatory against customers who generate solar power (doc. 144-4 at 3–16), Alabama Power provided its methodology and reasoning for implementing the charge, and the Public Service Commission held a hearing (Doc. 145-5 at 11–87; *see* doc. 145-6).

According to Natalie Dean, Alabama Power's pricing manager, Rate Rider RGB permits Alabama Power to recover the costs of providing supplementary and back-up power. (Doc. 145-5 at 11–31; doc. 145-6 at 30). She explained that Alabama Power incurs both "variable energy and fixed capacity costs" from providing electricity to Rate FD customers. (Doc. 145-5 at 20). Variable energy costs are things like fuel and operation and maintenance costs. (*Id.* at 23, 26). Residential customers who generate some of their own power reduce Alabama Power's variable costs. (*Id.*). Fixed capacity costs include "generation, transmission and distribution facilities." (*Id.* at 18). Residential customers who generate some of their own power do not reduce fixed capacity costs because Alabama Power must remain ready to provide enough electricity to serve the customers' "peak load at any time and under any condition." (Doc. 145-5 at 27). Because Rate FD was designed to recover costs from customers who get all their electricity from Alabama Power, customers who generate some of their own electricity but who do not pay for back-up power are not covering all of Alabama Power's fixed costs and "receiv[e] the benefit of Back-Up Power service at the expense of other customers." (*Id.* at 17, 19–20).

To design the capacity reservation charge, Alabama Power calculated the cost of service for the customer population likely to need back-up power. (*Id.* at 22–23). Alabama Power created a "representative customer" and calculated that customer's energy usage before and after installing her own generation. (*Id.* at 24–25). Alabama

Power began by looking at Rate FD customers who generated some of their own power and calculating the weighted average of their energy usage from before they installed their generators. (Doc. 145-5 at 24–25). Then, on the assumption that the customer would use solar generation because that was the predominant source of on-site generation among its customers, Alabama Power calculated how much energy a rooftop solar unit would generate in Alabama's three weather zones. (*Id.* at 25; doc. 145-6 at 17–19, 70). Finally, Alabama Power reduced the representative customer's energy usage by the weighted average of the energy the solar unit would generate. (Doc. 145-5 at 25).

Next, Alabama Power compared the representative customer's variable and fixed costs with and without solar generation. (Doc. 145-5 at 26). When a customer adopted solar generation, Alabama Power's variable costs fell for each kilowatt-hour of energy generated. (*Id.*). If Alabama Power did not maintain energy capacity sufficient to back-up the customer's generation, fixed costs also fell by $129 annually per kilowatt of on-site generation. (*Id.* at 26–27). But Alabama Power did have to maintain back-up capacity. (*Id.* at 26). Alabama Power "considered many factors, including customer diversification, the expected annual utilization, and the incremental capacity equivalent of the on-site generator" to determine that it would have to maintain the capacity to provide 65% of a generator's maximum at any time. (Doc. 145-5 at 26–27; doc. 145-6 at 59). As a result, Alabama Power concluded that

it needed to charge Rate RGB customers 65% of the $129 per kilowatt that would be saved if Alabama Power were not required to provide back-up power. (Doc. 145-5 at 27–28). It termed this a "35% credit." (*Id.* at 27).

Because customers who receive back-up power service also pay for supplementary service under Rate FD and Rate FD incorporates Alabama Power's costs, Alabama Power also needed to account for cost recovery under Rate FD. (*Id.* at 27–28). It therefore calculated the revenue differential between a non-solar Rate FD customer and a solar Rate FD customer. (*Id.* at 28, 96). It subtracted from that revenue differential the savings provided by a solar customer's generation of part of her own power to reach the annual net unrecovered costs. (*Id.* at 28–29, 96). Finally, it divided the annual net unrecovered costs to find the monthly cost per kilowatt: the capacity reservation charge.[2] (*Id.*).

Ultimately, the Public Service Commission denied the plaintiffs' challenge and adopted Alabama Power's proposed changes. (*See* doc. 142-15). The plaintiffs then petitioned the Federal Energy Regulatory Commission ("FERC") to enforce its regulations. (Doc. 146-10). FERC issued a "notice of intent not to act." (Doc. 146-11). Two concurring FERC commissioners issued a joint statement "express[ing] [their] concern" that the Public Service Commission "may be violating" FERC

---

[2] Alabama Power used roughly the same methodology to calculate the rate applicable to customers who elect Rate RTA. (Doc. 145-5 at 30, 87; doc. 142-26 at 35). The court omits the details because they do not affect the analysis in this case.

regulations. (Doc. 146-12). The concurring statement highlighted potential problems but did not reach an ultimate conclusion regard the Public Service Commission's compliance. (*See id.*).

The Public Service Commission has approved two amendments to Rate Rider RGB since the introduction of the capacity reservation charge. (Doc. 116 ¶¶ 46–47; doc. 117 ¶¶ 46–47; doc. 118 ¶¶ 46–47). The changes introduced with those amendments are not relevant to this case.

## II.   DISCUSSION

PURPA provides that electric utilities must set rates for the sale of electric energy to "qualifying cogenerators or qualifying small power producers"—which all parties agree the plaintiffs are—at a "just and reasonable" rate and without discriminating against them. 16 U.S.C. § 824a-3(c); (doc. 148 at 6 n.3; doc. 149 at 21 ¶ 72; doc. 156 at 12 (not disputing ¶ 72)). As required by the statute, FERC promulgated regulations to implement those directives. 16 U.S.C. § 824a-3(a), (c); *see Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, 45 Fed. Reg. 12214, 12229 (Feb. 25, 1980) (hereinafter "*Order 69*"). The relevant regulations are codified at 18 C.F.R. § 292.305.

Section 292.305(a) provides that rates for sales must "be just and reasonable and in the public interest" and must not "discriminate against any qualifying facility

9

in comparison to rates for sales to other customers." 18 C.F.R. § 292.305(a)(1). Section 292.305(b) provides that "upon request of a qualifying facility," utilities must provide supplementary and back-up power. *Id.* § 292.305(b)(1). And § 292.305(c) provides that rates for sales of back-up power "shall not be based on an assumption (unless supported by factual data) that forced outages or other reductions in electric output by all qualifying facilities on an electric utility's system will occur simultaneously, or during the system peak, or both." *Id.* § 292.305(c)(1). The plaintiffs contend that the Public Service Commission failed to implement all three subsections by approving Rate Rider RGB, which implements the capacity reservation charge and makes back-up power mandatory for residential customers who generate some of their own power. (Doc. 116 ¶¶ 52–99, A–D).

All three parties move for summary judgment. (Docs. 140, 141, 143). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because each motion and the respective responses mirror each other and often cross reference one another, and because the motions do not raise any disputes of fact and involve only questions of law, the court addresses all three motions in a single analysis.

1.  Subject Matter Jurisdiction

In their briefs, both the Public Service Commission and Alabama Power challenge the court's subject matter jurisdiction. (Doc. 147 at 7; doc. 148 at 7). Previously, Judge Thompson denied a motion to dismiss for lack of subject matter jurisdiction. (Doc. 96). The court reaches the same conclusion here.

PURPA established its own jurisdictional scheme. Under § 210(g), state courts have jurisdiction over "any proceeding conducted by a [public service commission] for purposes of implementing any requirement of a rule under [§ 210(a)]." 16 U.S.C. § 824a-3(g)(1). And § 210(h) gives federal courts jurisdiction over challenges to enforce a public service commission's obligation to implement FERC regulations. *Id.* § 824a-3(h)(2)(B). Federal courts have adopted a shorthand for the jurisdictional divide: federal courts have jurisdiction over "as-implemented" claims, meaning "a utility failed to implement a FERC rule, rendering its regulations or procedures facially illegitimate." *See Greensboro Lumber Co. v. Ga. Power Co.*, 844 F.2d 1538, 1542 (11th Cir. 1988); *Vote Solar v. City of Farmington*, 2 F.4th 1285, 1288 (10th Cir. 2021). State courts have jurisdiction over "as-applied" claims, which include "allegations that a utility's implementation plan is unlawful as applied to the individual petitioner." *See Greensboro Lumber Co.*, 844 F.2d at 1542; *Vote Solar*, 2 F.4th at 1288.

In passing, both Alabama Power and the Public Service Commission challenge this court's subject matter jurisdiction. But the plaintiffs bring as-implemented claims. The complaint, plaintiffs' summary judgment briefs, and evidence submitted challenge the Public Service Commission's decision to approve the Rate Rider RGB, which implements the capacity reservation charge and mandates back-up power. (*See, e.g.*, doc. 116; doc. 149). According to the plaintiffs, this action violates FERC regulations. The plaintiffs do not claim that the Public Service Commission's action was unlawful "as applied to the individual petitioner." *See Vote Solar*, 2 F.4th at 1288; *Greensboro Lumber Co.*, 844 F.2d at 1542. Instead, they assert a "general challenge," not limited to the individual plaintiffs, to the Public Service Commission's decision implementing back-up power and the capacity reservation charge by asking the court to declare the capacity reservation charge and back-up "mandate" unlawful for all customers. (*See* doc. 116); *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 393 (5th Cir. 2014).

Alabama Power cites two cases that concluded the court lacked jurisdiction at the summary judgment stage, but neither are persuasive. (*See* doc. 148 at 22–23). Both cases involved claims specific to the plaintiff; thus, the district courts held that they did not have jurisdiction over the as-applied claims. *See Greensboro Lumber Co. v. Georgia Power Co.*, 643 F. Supp. 1345, 1371–74 (N.D. Ga. 1986) (noting that the plaintiff alleged that the defendant "failed to provide [it] with back-up and

12

maintenance power at non-discriminatory, just and reasonable rates"); *Mass. Inst. of Tech. v. Mass. Dep't of Pub. Utilities*, 941 F. Supp. 233, 237–38 (D. Mass. 1996) (holding that the plaintiff brought an as-applied challenge when the plaintiff challenged a rate only it was subject to).

Accordingly, the court has subject matter jurisdiction.

## 2. Count One

Count One alleges that the Public Service Commission failed to implement § 292.305(a) because it allowed Alabama Power to impose the capacity reservation charge, which discriminates against qualifying facilities. (Doc. 116 ¶¶ 52–75). Under the regulation, rates for sale (1) must be "just and reasonable," (2) must be in the public interest, (3) and cannot "discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility." 18 C.F.R. § 292.305(a)(1). A rate does not discriminate if it is "based on accurate data and consistent systemwide costing principles," as long as it applies "to the utility's other customers with similar load or other cost-related characteristics." *Id.* § 292.305(a)(2).

The plaintiffs argue that the Rate Rider RGB's capacity reservation charge: (1) is not based on accurate data because Alabama Power developed it by using the representative customer's predicted energy usage instead of current solar customers' actual energy usage; (2) is not based on systemwide costing principles because

Alabama Power found that solar customers provided a fixed cost savings; and (3) does not apply to other customers with similar load characteristics because Alabama Power failed to evaluate actual energy usage patterns by its solar customers. (Doc. 149 at 29–33; doc. 158 at 35–43). The Public Service Commission and Alabama Power argue that: (1) the plaintiffs have not disputed the accuracy of the model Alabama Power used to predict solar customers' energy usage; (2) Alabama Power used systemwide costing principles because it based its analysis on an annual study it performs about the costs of service; and (3) the rate, which was designed to cover Alabama Power's fixed costs, applies to similar customers because residential customers who buy all their electricity from Alabama Power pay for those fixed costs through Rate FD. (Doc. 147 at 25–28; doc. 148 at 26–33). The court will address each argument in turn.

### a. Accurate Data

The regulations do not explain what qualifies as "accurate data." *See* 18 C.F.R. §§ 292.101, 292.305(1). Nor do the parties attempt to outline the requirements. (*See* doc. 147 at 25–26; doc, 148 at 26–33; doc. 149 at 29–31; doc. 158 at 35–37). The court does not need to define the term's parameters because the plaintiffs proffer no evidence to support their claim that Alabama Power and the Public Service Commission did not rely on accurate data.

The Public Service Commission and Alabama Power offered undisputed evidence regarding the underlying data used and the calculation methodology. (*See, e.g.*, doc. 147 at 12–16 ¶¶ 11–23; doc. 148 at 10–11 ¶¶ 14–15; doc. 158 at 22–24, 27). The plaintiffs argue that Alabama Power should have calculated the cost differential between solar and non-solar customers by looking at actual energy usage by solar customers, instead of predicting what their usage might be. (Doc. 149 at 31; doc. 158 at 35–37). But they do not cite any evidence that the predicted usage was inaccurate. (*See* doc. 158 at 35–37; doc. 149 at 31). They assert that "[e]valuating net usage would have enabled [Alabama Power] to determine the exact demands its existing solar customers place on the system and when those demands occur." (Doc. 149 at 17 ¶ 52). But the evidence cited does not support that assertion. (*See* doc. 145-6 at 41–43 (testifying that Alabama Power has data about solar customers' net usage but that such data would not have been helpful). They offer no evidence to counter Ms. Dean's testimony about Alabama Power's methodology. (Doc. 158 at 22–23 ¶¶ 11–12; *id.* at 35–37; doc. 149 at 31).

Indeed, the only evidence that the plaintiffs present in support of their argument is a statement from two FERC commissioners that Alabama Power compared "apples and oranges" when it compared customers' actual pre-solar-installation data against their predicted post-solar-installation data. (Doc. 149 at 31; doc. 158 at 35–37; doc. 162 at 16). Even assuming the commissioners' statement is

relevant, they did not conclude that Alabama Power relied on inaccurate data. (Doc. 146-12 at 4–5). Accordingly, no evidence establishes that Alabama Power relied on inaccurate data when crafting the capacity reservation charge.

### b. *Systemwide Costing Principles*

Next, the plaintiffs argue that the capacity reservation charge is not based on consistent systemwide costing principles because the charge is not based on systemwide costing principles but on Alabama Power's "desire to claw back revenue decreases." (Doc. 149 at 32). They base this argument on Ms. Dean's testimony that non-solar customers who do not need back-up power result in lower fixed costs to Alabama Power. (Doc. 145-5 at 25–26; *see* doc. 149 at 12–16 ¶¶ 39–47, 31–33; doc. 158 at 37). But Ms. Dean also testified that Alabama Power "does not avoid the fixed capacity costs when a customer with on-site generation requires Firm Back-up Power Service" because Alabama Power must hold that energy in reserve in the event it is needed. (Doc. 145-5 at 27; *see* doc. 145-6 at 31–32, 45).

Because all parties rely on Ms. Dean's testimony and she explained that the capacity reservation charge is designed to recover fixed capacity costs (doc. 145-5 at 27; doc. 147 at 13 ¶ 12; doc. 148 at 28), there is no evidence Alabama Power failed to use systemwide costing principles.

### c. Similar Load Characteristics

Under the regulation, any rate for sale does not discriminate against a qualifying facility "to the extent that such rates apply to the utility's other customers with similar load or other cost-related characteristics." 18 C.F.R. § 292.305(a)(1). In the preamble to the regulation, the FERC explained that "where a utility must reserve capacity to provide service to a qualifying facility, the costs associated with that reservation are properly recoverable from the qualifying facility if the utility would similarly assess these costs to non-generating customers." *Order 69*, 45 Fed. Reg. at 12228.

Here, Alabama Power and the Public Service Commission produced evidence that it calculated the capacity reservation charge to recover fixed costs associated with providing back-up power services. (*See* doc. 142-2 at 12–29; doc. 148 at 28–29; doc. 147 at 15–16 ¶¶ 18–23; doc. 145-5 at 17, 19–20, 27–28). The plaintiffs again dispute the methodology used because Alabama Power did not look at solar customers' actual energy usage after installing solar generators. (Doc. 149 at 33; doc. 158 at 39). But they fail to cite any evidence that establishes analyzing actual usage patterns would result in a better comparison. (Doc. 149 at 33; doc. 158 at 39). Nor do the plaintiffs argue that the modeled data inaccurately reflected the comparison between the representative residential customers with and without solar units. (*See* doc. 149 at 33; doc. 158 at 39). PURPA and its implementing regulations do not

17

mandate Alabama Power to adopt the plaintiffs' alternative method. *See Californians for Renewable Energy v. California Pub. Utilities Comm'n*, 922 F.3d 929, 936 (9th Cir. 2019) ("FERC intended to leave states with discretion in implementing its regulations under PURPA.").

Because the plaintiffs have not presented any evidence from which a factfinder could conclude that Alabama Power violated § 292.305(a), the court **WILL DENY** the plaintiffs' motion for summary judgment and **WILL GRANT** Alabama Power's and the Public Service Commission's motions for summary judgment on Count One.

3. Count Two

Section 292.305(b) provides in relevant part that "upon request of a qualifying facility, each electric utility shall provide: (i) supplementary power; and (ii) back-up power." 18 C.F.R. § 292.305(b)(1)(i)–(ii). Count Two asserts that the Alabama Public Service Commission failed to implement this rule because it allowed Alabama Power to mandate that solar customers accept back-up power instead of allowing them to request it. (Doc. 116 ¶¶ 76–88). The plaintiffs argue that Rate Rider RGB, which does not give solar customers the option to choose to accept back-up power, facially violates § 292.305(b). (Doc. 149 at 35–36; doc. 158 at 44).[3] The

---

[3] To the extent that the individual plaintiffs argue that they did not request back-up power, their claim would be an as-applied challenge, outside of this court's subject matter jurisdiction. *See Vote Solar*, 2 F.4th at 1288.

Public Service Commission and Alabama Power argue that the plaintiffs have confused "back-up power" for "supplementary power," and it is undisputed that the plaintiffs did request back-up power. (Doc. 147 at 29–31; doc. 148 at 33–37; doc. 156 at 14–24, 30–31; doc. 157 at 13–26, 32–35). The plaintiffs "agree that the definition of back-up power determines the outcome of" Count Two (doc. 158 at 47), but they contend that the Public Service Commission and Alabama Power are the ones who have confused back-up power and supplementary power (*id.* at 25–29).

When interpreting a regulation, the court starts with the text. *Landau v. RoundPoint Mortg. Servicing Corp.*, 925 F.3d 1365, 1369 (11th Cir. 2019). The court "evaluate[s] whether the plain language of the regulation unambiguously answers the question at issue when [it] consider[s] the regulatory language itself, the particular context in which that language appears, and the broader context and purpose of the regulatory scheme as a whole." *Id.* The court therefore begins by setting out the definitions of supplementary and back-up power.

The regulations define "supplementary power" as "electric energy or capacity supplied by an electric utility, regularly used by a qualifying facility in addition to that which the facility generates itself." 18 C.F.R. § 292.101(b)(8). "Back-up power" is "electric energy or capacity supplied by an electric utility to replace energy ordinarily generated by a facility's own generation equipment during an unscheduled outage of the facility." *Id.* § 292.101(b)(9).

19

The plaintiff contend that "unscheduled outages" are "periods of solar system failure and lack of service due to events like weather damage; vandalism[;] theft; fires; or other emergency conditions." (Doc. 149 at 10 ¶ 26). They focus on the cause of any outage, asserting that back-up power is necessary only when the facility inoperable. (*Id.* at 25–27). But, they argue, dips in power generation due to regular weather conditions like cloud cover do not make a facility inoperable and therefore do not amount to an "unscheduled outage" that would require back-up power. (*Id.* at 27). In the plaintiffs' view, supplementary power is any power they require that exceeds what the facility is generating as long as the facility is operating, and back-up power is any power they require when the facility is inoperable. (*Id.* at 28).

The Public Service Commission and Alabama Power contend that an "unscheduled outage is" "an outage not set for a particular time, which would include an outage related to cloud cover." (Doc. 147 at 30; doc. 148 at 34–36). This definition would encompass "partial outages," meaning when the on-site generation unit is producing some—but not its maximum capacity—energy output. (Doc. 156 at 22; doc. 157 at 15–17). The Public Service Commission and Alabama Power believe that back-up power fills the gap between what the facility is producing and what it can produce, and supplementary power provides any power in excess of what the facility is capable of producing.

The regulations do not define an "outage." *See* 18 C.F.R. § 292.101(b). But when considering "the particular context in which that language appears, and the broader context and purpose of the regulatory scheme as a whole," *Landau*, 925 F.3d at 1369, an "outage" includes when a solar unit is functioning but is not producing at its ordinary full-capacity rate because it does not have access to its fuel source. Three reasons support this conclusion.

Back-up power applies only when there is an "outage." Supplementary power must be "regularly used by a qualifying facility in addition to that which the facility generates itself." 18 C.F.R. § 292.101(b)(8). So supplementary power does not require any reduction in output. Instead, supplementary power is energy supplied on top of the facility's full capacity energy output. Thus, when solar units do not produce at full capacity due to cloud cover, the units experience an interruption in supply and reduction of output, which does not fall within supplementary power's definition. *See* 18 C.F.R. § 292.101(b)(8).

Second, back-up power supplied during an "outage" is "to replace energy ordinarily generated." *Id.* § 292.101(b)(9). Accordingly, when a solar unit does not produce its ordinary amount of energy output due to weather patterns or other interruptions, the energy supplied by Alabama Power replaces the amount the solar unit would have generated but for the interruption. (*See* doc. 145-5 at 27; doc. 149 at 21 ¶ 74; doc. 156 at 13 ¶ 74).

21

Third, the back-up power definition applies to all qualifying facilities. 18 C.F.R. §§ 292.101, 292.305. A qualifying facility can rely on several sources of power, including "biomass, waste, renewable resources, [and] geothermal resources." *See, e.g.*, *id.* §§ 292.101(b)(1), 292.204(b)(1). So a qualifying facility can experience an "outage" when it does not have its fuel source and is thus not producing energy that it would "ordinarily generate." *See id.* § 292.101(b)(9); *see also Outage*, Webster's New Collegiate Dictionary 814 (1977) (defining "outage" as "a period of interruption especially of electric current"). Accordingly, when a solar unit is not exposed to the sun and is not producing all the energy it is capable of producing, it experiences an outage.

The plaintiffs' argument essentially advocates an exception to the definition for solar units. (*See* doc. 158 at 46). In their view, a solar unit's "output varies throughout the day," and because this variation is expected, solar panels do not "ceas[e] to function when [they] should be functioning." (Doc. 149 at 27) (emphasis omitted). But this logical progression falters because it assumes an "outage" must be a complete termination of all power supply. And because an "outage" applies to all qualifying facilities receiving back-up power services, a solar unit's routine variability does not change the definition.

If any ambiguity remains, FERC guidance confirms that back-up power includes power supplied or reserved when a solar unit does not function at full

capacity because it does not have access to its fuel source. The plaintiffs concede that Order 69's "preamble, or supporting explanation, to the final rule provides context and guidance on FERC's final regulations" and rely on the order throughout their argument. (Doc. 158 at 18, 37, 40; doc. 149 at 29). Yet the plaintiffs ignore Order 69's illustrations of back-up and supplementary power. For supplementary power, "a cogeneration facility with a capacity of ten megawatts might require five more megawatts from a utility on a continuing basis to meet its electric load of fifteen megawatts." *Order 69*, 45 Fed. Reg. at 12229. Order 69 confirms the additional five megawatts "would normally be provided as supplementary power." *Id.* In the next paragraph, the order explains back-up power using the same example: "In the example provided above, a cogeneration facility might contract with an electric utility to have available ten megawatts, should the congenator's units experience an outage." *Id.*

As illustrated by Order 69's examples, because it is "regularly used by a qualifying facility in addition to that which the facility generates itself," supplementary power is energy provided on top of the facility's ordinary generation capacity when the qualifying facility cannot meet the total demand required, even when operating at full capacity. *See* 18 C.F.R. § 292.101(b)(8). But back-up power applies when the solar unit is not producing the energy it ordinarily generates. *See id.* § 292.101(b)(9).

23

On top of this, Order 69 connects weather patterns to back-up power services. *Order 69*, 45 Fed. Reg. at 12229 ("[W]eather data and performance data would constitute a sufficient basis to refute the assumption relating to the coincidence of the demands imposed, for example, by windmills or photovoltaics, with respect to their need for back-up power.").

Here, customers agree to receive back-up power when they sign a contract for service with Alabama Power. (*See, e.g.*, doc. 146-2 at 7–8). Thus, the customers request back-up service when they sign the contract. Moreover, the plaintiffs concede that they want—and contracted for—Alabama Power to provide energy when their solar units are not functioning at full capacity. (Doc. 149 at 21 ¶ 74; doc. 156 at 13 ¶ 74). Thus, they requested back-up power by seeking interconnection and signing service contracts. Because that request falls within the definition of back-up power and Alabama Power's definition in the Rate Rider RGB is consistent with the federal definition, the plaintiffs' argument fails. Accordingly, there is no evidence that the Public Service Commission unlawfully mandated back-up power service.

In their opposition to summary judgment and in their motion for summary judgment, the plaintiffs note that the Rate Rider RGB "incorrectly defines back-up power, impermissibly expanding the federal definition." (Doc. 158 at 43; doc. 149 at 9, 25). To the extent the plaintiffs contend the definition is an independent violation of § 292.305(b), the plaintiffs did not allege this as a basis for relief in their

24

complaint and cannot now rely on it at summary judgment. (*See* doc. 116 ¶¶ 52–99); *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 559 (11th Cir. 2013) (noting a party cannot amend their complaint in their response in opposition to summary judgment).

Accordingly, the court **WILL DENY** the plaintiffs' motion for summary judgment and **WILL GRANT** Alabama Power and the Public Service Commission's motions on Count Two.

4.  Count Three

Section 292.305(c)(1) provides that an electric utility cannot base a rate for sales of back-up power on an assumption that "all qualifying facilities" will experience "forced outages or other reductions in electric output" at the same time or during the system peak unless factual data supports the assumption. Count Three asserts that the Public Service Commission failed to implement § 292.305(c) because it allowed Alabama Power to make such "factually unsupported assumptions about simultaneous forced outages of customer-sited solar equipment." (Doc. 116 ¶ 99). Alabama Power and the Public Service Commission contend Alabama Power made no such assumption because the capacity reservation charge is based on a generator needing back-up power for 65% of its capacity. (Doc. 147 at 32–34; doc. 148 at 38–39; doc. 156 at 32–33; doc. 157 at 31–32).

Here, there is no evidence that Alabama Power assumed "all qualifying facilities" would experience outages at the same time. The only evidence before the court is Ms. Dean's testimony that the company recognized it could not assume outages would occur simultaneously, so it looked at "customer diversification, the expected annual utilization, and the incremental capacity equivalent of the on-site generator" to determine that it would have to maintain the capacity to cover 65% of a generator's maximum. (Doc. 145-5 at 27). The plaintiffs do not explain how reserving capacity to supply back-up power equates to assuming all qualifying facilities experience outages at the same time. (*See* doc. 149 at 34–45; doc. 158 at 53–57).

Because the plaintiffs do not proffer any evidence that contradicts Ms. Dean's testimony, the court **WILL DENY** the plaintiffs' motion for summary judgment and **WILL GRANT** the Public Service Commission's and Alabama Power's motions on Count Three.

## III.   CONCLUSION

For the reasons above, the court **WILL GRANT** the Public Service Commission's and Alabama Power's motions and **WILL ENTER SUMMARY JUDGMENT** in their favor. (Docs. 140, 141). The court **WILL DENY** the plaintiffs' motion. (Doc. 143).

**DONE** and **ORDERED** this March 25, 2026.

_____

**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE