**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JAMES H. BANKSTON, JR.;** | ) | |
| **RALPH B. PFEIFFER, JR.;** | ) | |
| **MARK JOHNSTON;** | ) | |
| **TERESA K. THORNE;** | ) | |
| **and GASP, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ALABAMA PUBLIC SERVICE** | ) | |
| **COMMISSION; CYNTHIA LEE** | ) | |
| **ALMOND, in her official capacity as** | ) | |
| **President of the Alabama Public** | ) | |
| **Service Commission; JEREMY H.** | ) | **Case No.: 2:21-cv-469-ACA-SMD** |
| **ODEN, in his official capacity as** | ) | |
| **Commissioner of the Alabama** | ) | **(OPPOSED)** |
| **Public Service Commission; and** | ) | |
| **CHRIS V. BEEKER, III, in his** | ) | |
| **official capacity as Commissioner of** | ) | |
| **the Alabama Public Service** | ) | |
| **Commission,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **ALABAMA POWER COMPANY,** | ) | |
| | ) | |
| **Intervenor-Defendant.** | ) | |

**<u>PLAINTIFFS' MOTION TO RECONSIDER</u>**

# TABLE OF CONTENTS

I.   The Order failed to properly apply the summary judgment standard. .............3

   A.  The Order adopted and relied on statements about back-up power that Plaintiffs specifically disputed. ...........................................................................4

   B.  The Order accepts disputed statements about Alabama Power's methodology as undisputed facts. ...................................................................9

   C.  The Order includes incorrect statements of "fact" that no party asserted in their filings. ..................................................................................................11

II.  The Order erroneously concluded that Plaintiffs failed to provide evidence supporting two of their claims. ............................................................................13

   A.  Count One .....................................................................................................14

      1.   Accurate Data ........................................................................................14

      2.   Consistent Systemwide Costing Principles .............................................18

      3.   Similar Load Characteristics...................................................................21

   B.  Count Three.......................................................................................................25

III. The Order's erroneous definitions of back-up power and supplementary power conflict with the federal definitions, the parties' definitions, and Alabama Power's formulation of the back-up power charges.............................................26

   A.  The Court erroneously changed the meaning of the federal definitions.....27

   B.  The Court adopted definitions that conflict with the parties' filings and with APC's formulation of the back-up power charges. ..................................34

CONCLUSION .................................................................................................35

Alabamians currently pay the highest electricity rates in the Southeast and the third highest residential monthly electricity bills in the nation, averaging $173/month.[1] Even among the top energy-consuming states, Alabamians' monthly bills are still the highest.[2] Meanwhile, Alabama Power's net profit rose 8% in 2025, "driven largely by higher revenues collected from customers through electricity rates and growing demand for power."[3] Without regard to these affordability issues, Alabama Power Company imposes a discriminatory, unsupported, and unneeded charge for "back-up power" (the "capacity reservation charge")[4] on customers who try to reduce their bills by generating their own solar power. With this punitive charge, it is no surprise that Alabama is last in the nation in residential solar kilowatts (kW) per customer. Doc. 162 at 3.

---

[1] William Thornton, *Katie Britt concerned 'Alabama has the highest power rates in the Southeast'*, AL.com (updated Jan. 22, 2026), https://www.al.com/news/2025/12/katie-britt-concerned-alabama-has-the-highest-power-rates-in-the-southeast.html (quoting Senator Britt: "We have the highest power rates in the Southeast. I think that is unacceptable."); U.S. ENERGY INFO. ADMIN., ELEC. POWER MONTHLY 137 (Mar. 2026), https://www.eia.gov/electricity/monthly/current_month/march2026.pdf; Jennifer Horton, *6 On Your Side Investigates: Alabamians pay some of the highest electric bills in the country*, WBRC (Nov. 20, 2025), https://www.wbrc.com/2025/11/20/your-side-investigates-alabamians-pay-some-highest-electric-bills-country/.

[2] *Id.*

[3] Jennifer Horton, *Alabama Power net profit rose $113M in 2025, what this means for customers*, WBRC (Feb. 19, 2026), https://www.wbrc.com/2026/02/19/alabama-power-net-profit-rose-113m-2025-what-this-means-customers/.

[4] Under Rate Rider RGB Part I.B, solar customers on Rates FD, SCH, or LPS must pay a charge for "firm back-up power service" (referred to herein as "capacity reservation charge" or "back-up charge"). Customers on Rate RTA can avoid paying this charge, but only by paying an alternative back-up charge. As the Court states, "[t]he distinctions between Rate FD and Rate RTA do not affect the analysis in this case." Doc. 165 at 3 n.1.

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiffs Bankston, Pfeiffer, Johnston, Thorne, and GASP, Inc. ("Plaintiffs") submit this motion respectfully requesting that the Court reconsider its Order granting summary judgment for Defendants the Public Service Commission and its Commissioners ("PSC") and Defendant-Intervenor Alabama Power Company ("Alabama Power" or "APC") (together, Alabama Power and the PSC are referred to as "Defendants") and denying summary judgment for Plaintiffs. Doc. 165 (the "Order"). This motion is filed within 28 days of the Order and thus is reviewed under Rule 59(e). *See Finch v. City of Vernon*, 845 F.2d 256, 258 (11th Cir. 1988).

Grounds for a motion to reconsider include "the need to correct clear error or manifest injustice," *Summit Med. Ctr. of Ala., Inc. v. Riley*, 284 F. Supp. 2d 1350, 1355 (M.D. Ala. 2003), or where the "Court has patently misunderstood a party, or has made a decision outside of the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension," *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (quotations omitted).

Plaintiffs request that the Court reconsider the Order due to three clear errors: (1) the Order failed to properly apply the summary judgment standard; (2) the Order erroneously concluded that Plaintiffs failed to provide evidence supporting two of their claims; and (3) the Order's erroneous definitions of back-up power and supplementary power conflict with the federal definitions, the parties' definitions,

2

and Alabama Power's formulation of the back-up charge.

## I.     The Order failed to properly apply the summary judgment standard.

The Court correctly recites the summary judgment standard of review, Doc. 165 at 2, 10, but fails to apply it by improperly resolving factual disputes against Plaintiffs and by overlooking substantial evidence presented by Plaintiffs.

"Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Kinsale Ins. Co. v. Pride of St. Lucie Lodge 1189, Inc.*, 135 F.4th 961, 968 (11th Cir. 2025) (quotations omitted). Additionally, on motions for summary judgment, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Id.* (quotations omitted). The Eleventh Circuit has "cautioned that the mere filing of cross-motions do[es] not automatically empower the court to enter summary judgment for one party." *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile, Ala.*, 83 F.4th 922, 926 (11th Cir. 2023) (internal quotations omitted). "Instead, the district court must methodically take each motion in turn and construe all the facts in favor of the non-movant for each." *Id.* In other words, "the [C]ourt must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Wright & Miller's Federal Practice & Procedure § 2720 (4th ed. 2026).

3

The Order proclaims that the parties' motions for summary judgment "do not raise any disputes of fact and involve only questions of law." Doc. 165 at 10. Not so. Plaintiffs explicitly disputed Defendants' material factual assertions adopted by the Court in their responsive brief ("Response"). *See* Doc. 158 at 20-30. And except for Count Two, this is not a case that presents purely legal questions "that can be resolved without any reference to any disputed facts." *Dupree v. Younger*, 598 U.S. 729, 735 (2023).

Thus, the analysis and conclusions in the Order are based on an erroneous premise that Plaintiffs do not or did not dispute the facts set forth in the Court's "description of undisputed facts" which were applied to all three motions for summary judgment. *See* Doc. 165 at 3-9. In their briefs, Plaintiffs disputed many of the "facts" included in the Order.[5] Additionally, in finding for the Defendants, the Court improperly weighed the evidence, accepted Defendants' disputed facts as true, and ignored conflicting evidence cited by the Plaintiffs. Doing so is clearly erroneous under the summary judgment standard, and the Court must reconsider and vacate its decision on the parties' motions.

### A. The Order adopted and relied on statements about back-up power that Plaintiffs specifically disputed.

The Court deferentially accepts Defendants' alleged facts regarding the cost

---

[5] Representative examples of the Order's errors are enumerated *infra*. However, for sake of brevity, Plaintiffs have not included an exhaustive list of every disputed fact.

to Alabama Power of providing back-up power service to Plaintiffs. Notably, the Order heavily cites the testimony of Alabama Power's witness Natalie Dean from the administrative proceeding before the PSC (the "PSC proceeding") in its description of the undisputed facts. *See* Doc. 165 at 6-9 (repeatedly citing Dean's testimony, Doc. 145-5), without acknowledging that Plaintiffs disputed material portions of Dean's testimony through direct rebuttal testimony by Karl Rábago in the PSC proceeding, *see* Doc. 145-4 at 7, and a report by Rábago in this case, *see* Doc. 145-1. Plaintiffs also directly disputed Dean's testimony in their Response, Doc. 158, which the Court indicates was considered in issuing the Order, Doc. 165 at 2-3.[6] The Order omits the conflicting evidence and instead recites Dean's testimony as undisputed fact without even acknowledging Rábago's testimony.

Specifically, the Order lists four key facts regarding back-up power as undisputed when Plaintiffs explicitly disputed them. First, the Order states: "Residential customers who generate some of their own power do not reduce fixed capacity costs because Alabama Power must remain ready to provide enough electricity to serve the customers' 'peak load at any time and under any condition.'" Doc. 165 at 6 (quoting Doc. 145-5 at 27). Plaintiffs explicitly disputed that

---

[6] While Plaintiffs explained that they do not dispute that Alabama Power and the PSC correctly quoted Dean's testimony in their summary judgment motions, Plaintiffs did provide specific evidence disputing the substance of Dean's claims and her conclusion that the back-up charges at issue recover costs associated with providing back-up service. Doc. 158 at 22-23.

contention in both their Motion and their Response. Plaintiffs stated in their Motion that "APC calculated that solar customers are less costly to serve by approximately [$0.0253/kilowatt-hours ("kWh")][7] in variable energy costs and $129/kW annually in fixed costs[,]" Doc. 149 ¶ 39, and that "[e]ven with the reduced 35% credit, solar customers still produce fixed capacity cost savings of $45.15/kW annually (35% of $129/kW)[,]" *id.* ¶ 44. In their Response, Plaintiffs directly disputed the PSC's assertion that Alabama Power incurs fixed capacity costs from providing back-up power to its customers on Rate FD with on-site generation, *compare* Doc. 147 ¶ 12 *with* Doc. 158 at 22-23 ¶¶ 11-12 ("Rate FD, which Plaintiffs are on, is designed to recoup all costs of service for the entire rate class through volumetric charges per kilowatt hour, which recovers both fixed and energy costs . . . ."), and Alabama Power's assertion that there are unrecovered fixed costs associated with providing back-up power service to solar customers, *compare* Doc. 148 ¶ 39 *with* Doc. 158 at 29 ¶¶ 34-39 (noting these alleged "facts" from the PSC Order were disputed in the PSC proceeding by Rábago). Thus, Plaintiffs did show there are fixed capacity cost savings to APC associated with solar customers.

Second, the Order states: "Because Rate FD was designed to recover costs from customers who get all their electricity from Alabama Power, customers who

---

[7] Plaintiffs inadvertently wrote $0.253/kWh rather than the correct figure $0.0253/kWh in ¶ 39 of their summary judgment brief, Doc. 149. *See* Doc. 162 at 5 n.3 (correcting the error).

generate some of their own electricity but who do not pay for back-up power are not covering all of Alabama Power's fixed costs and 'receiv[e] the benefit of Back-Up Power service at the expense of other customers.'" Doc. 165 at 6 (citing and quoting Doc. 145-5 at 17, 19-20). Plaintiffs cited evidence that solar customers are *less costly to serve*, rebutting the premise that they receive any benefit at the expense of other customers. Doc. 149 ¶¶ 39-47. Specifically, Plaintiffs cited evidence that Alabama Power determined that solar customers on Rate FD produce *savings* relative to non-solar customers on Rate FD. *Id.* (citing Dean's testimony and Alabama Power's own calculations in the exhibits to Dean's testimony). Plaintiffs disputed the same claim in their Response, *compare* Doc. 148 ¶ 35 *with* Doc. 158 at 29 ¶ 34-39 (citing Doc. 145-4), again showing Dean's testimony was rebutted by Plaintiffs' expert Rábago, *see, e.g.* Doc. 145-4 at 29 ("[E]ven under the most fantastical assumptions of unscheduled outages at all Rate Rider RBG Part I.B distributed generation facilities, there is no credible claim of any incremental investment or cost incurred to provide back-up power service."). Alabama Power does not point to *any* evidence, other than Dean's disputed testimony and the PSC's Order,[8] that without the capacity reservation charge, other customers would bear the cost of providing back-up service to solar customers. The Court erred by stating this as an undisputed fact supporting

---

[8] Plaintiffs explained in their Response that the findings and legal conclusions in the PSC's order are not undisputed facts or competent evidence in this case. Doc. 158 at 20-21.

its analysis and conclusion.

Third and fourth, the Order states: "If Alabama Power did not maintain energy capacity sufficient to back-up the customer's generation, fixed costs also fell by $129 annually per kilowatt of on-site generation. But Alabama Power did have to maintain back-up capacity." Doc. 165 at 7. Plaintiffs agree that fixed costs are reduced but squarely dispute that the back-up charge actually recovers costs of providing true back-up power to solar customers. *See* Doc. 158 at 22-23 ¶¶ 11 (stating "Plaintiffs dispute whether the back-up charges recover costs associated with providing back-up power service"; "the evidence demonstrates that (1) solar customers are less costly to serve than comparable customers without solar . . . (2) Rate FD, which Plaintiffs are on, is designed to recoup all costs of service for the entire rate class through volumetric charges per kilowatt hour, which recovers both fixed and energy costs . . . [and] (3) APC's calculation of back-up service costs was based on its lost revenue, not cost of service of solar customers" and providing specific cites to the record); 12 (stating that Plaintiffs "dispute the substance of the testimony as it applies to Plaintiffs and similar situated customers for the reasons stated in response to paragraph 11"). Alabama Power admits the charge equates to its lost revenue from solar customers. Doc. 149 ¶ 48 (citing Doc. 146-6 at 82); *see also* Doc. 156 at 11 (failing to dispute Doc. 149 ¶ 48); Doc. 157 at 12 (same). This is not a coincidence and demonstrates that the back-up charge was not designed in a manner that

8

complies with FERC's regulations because it was not based on the cost to serve solar customers. Doc. 149 at 31-33; Doc. 158 at 37; Doc. 162 at 15-16. Therefore, the Court's finding that APC had to maintain back-up capacity to provide what it calls back-up power to Plaintiffs (actually supplemental power) and that doing so negated the savings provided by solar customers is not based on undisputed facts. At the summary judgment stage, it was not appropriate for the Court to accept the Defendants' evidence over the Plaintiffs' conflicting evidence.

## B. The Order accepts disputed statements about Alabama Power's methodology as undisputed facts.

The Court erroneously labeled several statements about Alabama Power's methodology in developing the capacity reservation charge as *undisputed* fact. These contested statements all accept the premise that back-up power service to solar customers results in unrecovered costs. *See, e.g.,* Doc. 165 at 7-8 ("As a result, Alabama Power concluded that it needed to charge Rate RGB customers 65% of the $129 per kilowatt that would be saved if Alabama Power were not required to provide back-up power."); *id.* at 8 ("Because customers who receive back-up power service also pay for supplementary service under Rate FD and Rate FD incorporates Alabama Power's costs, Alabama Power also needed to account for cost recovery under Rate FD."); *id.* (stating that Alabama Power "calculated the revenue differential between a non-solar Rate FD customer and a solar Rate FD customer" and "subtracted from that revenue differential the savings provided by a solar

9

customer's generation of part of her own power to reach the annual net unrecovered costs," which it then divided by 12 to find the monthly charge).

While the specific steps used to develop the charge are not disputed, Plaintiffs specifically disputed "whether the back-up charges recover costs associated with providing back-up power service, Doc. 158 ¶ 11, and factually rebutted the *substance* of Dean's testimony, that is, "the methodology used by APC to develop the back-up charges and whether the PSC's approval of the back-up charges complies with federal law[,]" Doc. 158 at 25 ¶¶ 22-23; *see also id.* at 21; 24-25 ¶¶ 14-17, 18, 19-20, 21. Plaintiffs also disputed "the methodology that APC used to determine the cost differential." *Id.* at 25 ¶¶ 19-20, 21. As an initial matter, Plaintiffs disputed the PSC and APC's interpretations of back-up power and supplementary power, Doc. 149 at 24-28; Doc. 158 at 44-50; Doc. 162 at 10-15, and as a result, they also disputed the efficacy of the methodology used to develop the charge because it was based on an incorrect premise that solar customers need back-up power under certain circumstances (i.e., cloud cover) when they actually need supplementary power during those times, Doc. 149 at 28-29; Doc. 158 at 47; Doc. 162 at 10, 14-15. Beyond that, Plaintiffs disputed specific steps taken in the methodology and cited evidence that the charge does not comply with PURPA and its regulations. For example, as shown by its own calculations, Alabama Power's service to solar customers *does not* result in unrecovered costs or costs associated with providing back-up power service.

10

To the contrary, Plaintiffs' evidence shows that solar customers are *less costly* to serve than non-solar customers. *See* Doc. 158 at 22 ¶ 11 (providing specific cites to record). In addition, Plaintiffs' evidence shows that the methodology did not use accurate data and consistent systemwide costing principles to determine the cost differential, and therefore, the back-up charge. Doc. 158 at 25 ¶¶ 19-20, 21 (citing Doc. 149 at 23-37) ("Plaintiffs do not dispute . . . that the calculations by APC showed that solar customers are less costly to serve than non-solar customers but do dispute the methodology that APC used to determine the cost differential . . . ."). Therefore, it is not undisputed that the revenue differential and the solar customer savings is "net unrecovered costs," Doc. 165 at 8, and it was clear error to frame it as such. As above, these factual findings directly relate to whether Defendants relied on accurate data and systemwide costing principles in formulating the capacity reservation charge.

### C. The Order includes incorrect statements of "fact" that no party asserted in their filings.

The Order also cites statements as fact that none of the parties asserted or proved. These factual findings are not errors of reasoning but of apprehension. *See Z.K. Marine Inc.*, 808 F. Supp. at 1563. While some of these statements are peripheral to the ruling, these errors demonstrate fundamental misunderstandings of the case that presumably colored the analysis and conclusions in the Order. First, the Order states: "Alabama Power bases how much energy it must keep available for

11

each customer on the maximum capacity of electricity the customer can generate." Doc. 165 at 5. None of the parties contend that Alabama Power is reserving *energy* to provide back-up service to solar customers. Rather, Alabama Power claims it must reserve *capacity* to provide back-up power to solar customers. Doc. 147 at 30 n.11 ("*Electric energy* refers to the amount of electricity used over a period of time, measured in kilowatt hours. *Electric capacity* refers to the generation capacity that a utility must reserve to meet the full demand of the customer, measured in kilowatts. In this case, the subject charges are only for the reservation of the electric capacity . . . ".") (emphasis in original); *see also* Doc. 148 ¶ 54; Doc. 149 ¶ 10.

Second, the Order incorrectly states as fact that "[a]fter the plaintiffs filed an administrative complaint with the PSC challenging the capacity reservation charge as discriminatory against customers who generate solar power . . . , Alabama Power provided its methodology and reasoning for implementing the charge . . . ." Doc. 165 at 5. Plaintiffs filed an administrative complaint with the PSC challenging Rate Rider RGB Revision Fifth (the first revision with a capacity reservation charge), and Alabama Power responded by filing a proposed modification to increase the charge and attached Dean's testimony. Following the PSC proceeding, the PSC approved the modification, resulting in Revision Sixth. Doc. 149 ¶¶ 18-19. Alabama Power has never provided its methodology behind the $5.00 per kW capacity reservation charge in Revision Fifth. Nor did Plaintiffs have the opportunity to obtain it during

discovery as the Court granted a protective order preventing any discovery on Revision Fifth. Doc. 138. As the record stands, APC's methodology for the calculation of the charge supporting Revision Fifth has not been disclosed.

Relatedly, the Order incorrectly states as fact that the changes made in Revisions Sixth and Seventh are not relevant to this case. Doc. 165 at 9. The $5.41 per kW capacity reservation charge at issue in this case was introduced with Revision Sixth and is currently effective as Revision Seventh. Doc. 149 ¶¶ 19, 64. This case challenges the back-up charges that were approved by the PSC, resulting in Revision Sixth, and are still effective in Revision Seventh.

## II.   **The Order erroneously concluded that Plaintiffs failed to provide evidence supporting two of their claims.**

The Order incorrectly states that Plaintiffs proffered no evidence supporting Counts One and Three, when Plaintiffs provided material evidence supporting their claims and rebutting Defendants' summary judgment motions. As addressed *supra*, on summary judgment, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Kinsale Ins. Co.*, 135 F.4th at 968. On cross-motions for summary judgment, a court has two options: (1) if the material facts are disputed, the court must deny the cross-motions; or (2) if there are no undisputed material facts, then the court determines whether any movant is entitled to summary judgment as a matter of law. Here, the Court erred by effectively choosing a third,

13

impermissible option of simply disregarding Plaintiffs' evidence to justify granting summary judgment in Defendants' favor.

**A. Count One**

The presumption in FERC's regulations governing rates for sales to qualifying facilities (QFs) (i.e., small-scale solar facilities) is that no additional charges are warranted simply because a customer is a QF. *See* 45 Fed. Reg. 12214, 12228 (Feb. 25, 1980); 18 C.F.R. § 292.305(a). To impose additional charges or a different rate, the rate must be "based on accurate data" and "consistent systemwide costing principles," and must apply "to the utility's other customers with similar load or other cost-related characteristics." *Id.* § 292.305(a)(2).

1. *Accurate Data*

The Order erroneously states that "the plaintiffs proffer no evidence to support their claim that Alabama Power and the [PSC] did not rely on accurate data." Doc. 165 at 14. To the contrary, Plaintiffs presented evidence that the inputs and methodology used to calculate the back-up charge were not based on "accurate data" as required by § 292.305(a)(2). *See* Doc. 149 at 31 (citing Doc. 149 ¶¶ 33-49, 52; Doc. 146-12 at 4-5 (Ex. N)); Doc. 162 at 15-17 (citing Doc. 149 ¶¶ 36-38, 40; Doc. 146-12 at 5 (Ex. N); Doc. 145-6 at 40-42). Specifically, Plaintiffs presented undisputed facts that the back-up charge was calculated by comparing two load profiles—one based on actual, metered usage for Rate FD customers deemed likely

14

to install solar (but *prior to* installing solar) and one based on modeled solar data. Doc. 149 ¶¶ 36-38; Doc. 156 at 7-8 (failing to dispute Doc. 149 ¶¶ 36-38); Doc. 157 at 10-11 (discussing the actual versus modeled load profiles). It is also undisputed that Alabama Power has accurate, metered usage data for customers who have installed solar generation. Doc. 162 at 16 (citing Doc. 145-6 at 40-42 ("Q. Well, you – customers who have adopted solar, you do have their net usage? A. I have their net usage.")). Plaintiffs also presented evidence from FERC's concurrence finding that metered net usage is *the* correct measurement point for comparison:

> The Alabama Commission appears to contend that the project was necessary to isolate the amount of production from the solar array…But the cost of *serving* customers depended not on solar production but rather on the amount of load served by Alabama Power. Thus, *Alabama Power's own metered usage data was the relevant measurement point both before and after solar installation.*

Doc. 146-12 at 5 n.13 (emphasis added); *see also* Doc. 162 at 16 (citing the concurrence and stating "[t]he outcome did not show the actual demands that solar customers put on the grid—the use of metered usage data both before and after solar installation would have"). Using these facts, Plaintiffs provided evidence that subtracting the modeled projection data from the actual usage patterns produced an inaccurate *outcome* because it compared fundamentally different types of data. The resulting inaccurate data was then used by Alabama Power to calculate the back-up charge. Doc. 149 ¶¶ 39-40, 44-46, 49. Together, this is evidence that the data used by Alabama Power was not the appropriate measure and was not accurate, under the

15

regulatory standard, for the intended purpose of determining the cost to serve solar customers. The cost to serve depends on the load served by Alabama Power (in other words, the solar customer's *actual*, metered usage *after* installing solar), not on the amount produced by her solar system. *See* Doc. 146-12 at 4-5, 5 n.13; Doc. 149 at 31-32; Doc. 158 at 36-37; Doc. 162 at 16. At a minimum, Plaintiffs' evidence raises a dispute of material fact on the issue.

Plaintiffs also proved that the back-up charge was calculated based on Alabama Power's "informed judgment" that solar customers should receive a 35% credit for the fixed cost savings attributable to solar deployment. Doc. 162 at 17 (citing Doc. 149 ¶ 40); Doc. 145-6 at 59; Doc. 145-3 at 5-8 (stating that while the 35% credit took into account various factors, it was not based on a numerical representation but instead on the company's judgment). Judgment is subjective and, by definition, not data (accurate or not). Thus, Plaintiffs cited evidence that Defendants did not rely on accurate data and the Court ignored the rebuttal evidence by stating that it did not exist—a clear error.

Next, plainly construing the evidence in Defendants' favor, the Order uncritically accepted as fact Dean's statement that actual data for existing solar customers "would not have been helpful," and concluded that her testimony somehow negated Plaintiffs' assertion that "[e]valuating net usage would have enabled [Alabama Power] to determine the exact demands its existing solar

16

customers place on the system and when those demands occur." Doc. 165 at 15 (citing Doc. 149 at 17 ¶ 52; Doc. 145-6 at 41-43). This conclusion is based on either a fundamental misunderstanding of Plaintiffs' briefs or a factual determination improper on summary judgment, or both. Plaintiffs demonstrated that Alabama Power *has* data that is the proper measurement point to make this comparison but relied on *modeled* data and assumptions, rendering its outcome inaccurate. Dean's opinion as to the usefulness of actual data from solar customers cannot be accepted as correct, much less as an undisputed fact at this stage. On summary judgment, a Court may not credit Defendants' witness over Plaintiffs' evidence regarding disputed facts.

Finally, the Order's statement that Defendants "offered undisputed evidence regarding the underlying data used and the calculation methodology" does not establish that the rates were based on *accurate* data. Doc. 165 at 15. Of course, Alabama Power will try to defend its own methodology, but its rationalizations are not undisputed facts, nor are they entitled to deference here. The dispute is not about Alabama Power's ability to perform calculations; it is about whether the framework and methods giving rise to those calculations were based on "accurate data" in this context. Plaintiffs factually disputed the legitimacy and the legality of Defendants' methodology and how the underlying data was used to calculate the back-up charges. *See, e.g.*, Doc. 158 at 22-26 ¶¶ 14-17, 18, 19-20, 21, 22-23, 30, 31.

17

## 2. *Consistent Systemwide Costing Principles*

As to the second element of Count One, the Order incorrectly concludes that "[b]ecause all parties rely on Ms. Dean's testimony and she explained that the capacity reservation charge is designed to recover fixed capacity costs . . . , there is no evidence Alabama Power failed to use systemwide costing principles." Doc. 165 at 16. But Plaintiffs presented material evidence that Alabama Power failed to use consistent systemwide costing principles by specifically disputing Dean's testimony. Moreover, as discussed below, it appears that the Court incorrectly equated the recovery of fixed capacity costs with the use of consistent systemwide costing principles.

First, Plaintiffs provided undisputed evidence that the back-up charge was not based on consistent systemwide costing principles. Doc. 149 ¶¶ 31, 39-46, 45-47, 55-57; Doc. 158 at 37 (citing Doc. 149 ¶¶ 39, 44, 46); Doc. 162 at 16-17 (citing Doc. 149 ¶¶ 45, 55). Consistent systemwide costing principles mean rates are based on "traditional ratemaking (*i.e.*, cost-of-service) concepts" that are applied consistently across the utility's system. 45 Fed. Reg. at 12228; *Oglethorpe Power Corp., et al.*, 35 FERC ¶ 61069, 61137 (1986) ("[R]ates for these services should be cost-based."). Here, it is undisputed that: (1) Alabama Power bases its rates on the cost to serve each customer class, Doc. 149 ¶ 31; *see* Doc. 156 at 7 (failing to dispute Doc. 149 ¶ 31); Doc. 157 at 10 (same); (2) Alabama Power calculated that the hypothetical solar

customer would use 5,358 kWh less than the non-solar customer and pay $609 less for electricity from Alabama Power, Doc. 149 ¶ 45; *see* Doc. 156 at 10 (failing to dispute Doc. 149 ¶ 45); Doc. 157 at 12 (same); and (3) Alabama Power based the capacity reservation charge on recovering some of that $609, which is its loss in revenue due to the customer purchasing fewer kWh, Doc. 149 ¶ 48; Doc. 156 at 11 (failing to dispute Doc. 149 ¶ 48); Doc. 157 at 12 (same). The charge undisputably is based not on solar customers' usage (their cost-to-serve), but on recovering lost revenue. Alabama Power developed the rate using a *different* method for Rate FD solar customers (based on recovering lost revenues) than it does for non-solar Rate FD customers (based on cost to serve). The Order failed to acknowledge this factual dispute and its legal significance--non-compliance with the regulatory text. Alabama Power clearly used inconsistent costing principles in developing the back-up charges. At a minimum, Plaintiffs provided evidence that precludes summary judgment in Defendants' favor, and the Court committed clear error by concluding otherwise.

The record also includes the expert opinion of Plaintiffs' expert Rábago, who also provided testimony during the PSC proceeding. In his report, he stated that "Alabama Power's calculations used to determine the back-up power charges wrongfully treat lost revenues as a cost created by solar customers." Doc. 145-1 at 30. Lost revenues are not a cost because cost-of-service regulation (which again is

how Alabama Power develops its rates) is based on usage—"[n]ot using a utility service cannot create recoverable costs." *Id.* at 31. "[E]lectric service under cost-of-service regulation is not a 'take or pay' service. Just and reasonable rates should only charge customers for costs created through *use* of a utility service." *Id.* Here, the charge is not based on usage by the solar customer, but on recovering lost revenues to which Alabama Power is not entitled. Rábago's testimony, while almost certainly disputed by Defendants, demonstrates the conflicting evidence provided in the record, which precludes summary judgment for the Defendants, with respect to the validity of APC's methodology.

Next, Plaintiffs' acknowledgment of the specific steps taken by Alabama Power to calculate its charges is not agreement with the substance of Dean's statements and opinions. Plaintiffs specifically dispute the premise that Alabama Power "does not avoid the fixed capacity costs when a customer with on-site generation requires Firm Back-Up Power Service." *See supra* Section I.A. In addition, Plaintiffs "clearly dispute that the Company employed standard rate making techniques in its development of the back-up charges in Count One." Doc. 158 at 26 ¶ 31; *see* Doc. 147 at 26. And Plaintiffs specifically state throughout their Response that they factually dispute the methodology and whether the Commission's approval of the methodology and the resulting back-up charge complies with federal law. *See, e.g.*, Doc. 158 at 22-26 ¶¶ 14-17, 18, 19-20, 21, 22-23, 28, 30, 31.

20

Finally, the Order fundamentally misconstrues the regulatory requirement that the back-up charge must be based on systemwide costing principles. Contrary to the Order's conclusion, it does not logically follow that just because the utility's witness testifies that the charges were designed to recover fixed capacity costs (a point that Plaintiffs dispute *supra*), it automatically means the charges were based on systemwide costing principles. *See* Doc. 165 at 16. The charge must be developed in a manner that is consistent with methods used to develop other rates, i.e., the *cost to serve* the customer class. Doc. 149 ¶ 31. The Order ignored clear proof that the back-up charge is inconsistent with other rate-making methods used by the utility and approved by the PSC and valid legal arguments that Alabama Power did not use consistent systemwide costing principles. *See* Doc. 149 at 31-33, Doc. 158 at 37, 43; Doc. 162 at 16-17. The Order's reliance on Alabama Power's self-serving statements about fixed capacity costs does not establish compliance with this requirement or negate contrary facts in the record.

3. *Similar Load Characteristics*

The Order also misapplied the third element of Count One and implied that, to withstand summary judgment, Plaintiffs had to carry Alabama Power and the PSC's burdens on this claim. Pursuant to the regulation, "[r]ates for sales which are based on accurate data and consistent systemwide costing principles shall not be considered to discriminate against any qualifying facility *to the extent that such rates*

21

*apply to the utility's other customers with similar load or other cost-related characteristics.*" 18 C.F.R. § 292.305(a)(2) (emphasis added); *see* Doc. 165 at 13. Meaning, in part, that unless the utility can prove otherwise, "the rate for sales shall be the rate that would be charged to the class to which the qualifying facility would be assigned if it did not have its own generation." 45 Fed. Reg. at 12228. Therefore, the utility (or in this instance, the state authority that approved the rate) must show that the rate is *not discriminatory* as described in the regulation. *Id.* The Order states that "Alabama Power and the Public Service Commission produced evidence that it calculated the capacity reservation charge to recover fixed costs associated with providing back-up power services." Doc. 165 at 17. But Plaintiffs cited rebuttal evidence showing that the Defendants *did not demonstrate* that the rates apply to the utility's *other* customers (i.e., those without solar systems) with similar load or other cost-related characteristics. *See* Doc. 149 at 33 (citing ¶¶ 52-53); Doc. 158 at 38-39 (citing Doc. 158, Section III.C ¶ 3; Doc. 149 ¶¶ 31, 32, 54); Doc. 162 at 17-18 (citing Doc. 149 ¶¶ 52-53, 56-57; Doc. 146-12 at 4 (Ex. N)). Plaintiffs put forward undisputed evidence that the Rate FD class is diverse, meaning that Rate FD customers' usage patterns vary. Doc. 149 ¶ 31; *see* Doc. 158 at 31 ¶ 3 (describing four different categories of Rate FD customer usage). For instance, some Rate FD customers are low electricity users while others are high users. *Id.* It is also undisputed that Alabama Power did not determine how solar customers' *actual* usage

patterns compared to the whole Rate FD class, meaning that the utility did not show that solar customers are not similar to some Rate FD customers, who have a wide range of electricity usage. Doc. 149 ¶ 53; *see* Doc. 156 at 11 (failing to dispute Doc. 149 ¶ 53); Doc. 157 at 12 (same). Without making this determination, Defendants have not and cannot demonstrate that the rate (the charge) applies to the utility's other customers that have similar load or other cost-related characteristics because they do not know if the other customers' load profiles are in fact similar or different. If they are not different, then the charge is unjustified. FERC's concurrence states that "neither [the PSC nor Alabama Power] sufficiently demonstrates that QF customer load profiles are in fact different from those of customers without on-site generation (who are not required to pay the Rate Rider RBG [sic] charge)"). Doc. 146-12 at 4. It is Defendants who have not produced undisputed facts to meet their burden. It was improper to cite and accept the Defendants' contentions while ignoring the conflicting evidence.

The Order reduces Plaintiffs' arguments that Alabama Power has failed to show that the charge applies to other similar customers to a mere disagreement about methodology. Doc. 165 at 17 ("The plaintiffs again dispute the methodology used because Alabama Power did not look at solar customers' actual energy usage after installing solar generators.") (citing Doc. 149 at 33; Doc. 158 at 39). The Order then leaps to placing the burden on Plaintiffs to propose a "better comparison." *Id.* at 17.

23

But Plaintiffs were not required to provide evidence of a *better* rate or comparison in response to Defendants' summary judgment motions; they were required to—and, in fact, did—proffer evidence that the PSC and APC failed to prove the implemented rates for sales apply to the utility's other customers with similar load or other cost-related characteristics, as discussed *infra*. *See* 45 Fed. Reg. at 12228 (stating that the utility must show that a different rate is justified); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (the movant for summary judgment always bears the initial burden to demonstrate it is entitled to judgment as a matter of law). Because Defendants did not and could not establish that the back-up charge applies to Alabama Power's other customers with similar load or other cost-related characteristics, the charge is discriminatory and unjust. The Order does not discuss the actual standard provided in the regulation or establish how it has been met. Without analyzing Plaintiffs' evidence and argument, the Court then erroneously concluded that the back-up charge complies with the regulation.

Across each of the three elements of Count One, the Order errs in concluding that Plaintiffs failed to present evidence. Contrary to the Order, Plaintiffs presented material evidence demonstrating that Defendants' charges do not satisfy 18 C.F.R. § 292.305(a). To the extent the Court considered this evidence but rejected it, the Order reflects an impermissible evidentiary determination. To the extent the Court merely overlooked these citations and evidence, the Court effectively ignored existent

24

factual disputes. Either way, the Order did not account for many disputes of fact, and doing so would have precluded summary judgment for the Defendants as a matter of law.

### B. Count Three

In Count Three, Plaintiffs assert that the PSC failed to implement 18 C.F.R. § 292.305(c), which requires that "[t]he rate for sales of back-up power or maintenance power: (1) shall not be based upon an assumption (unless supported by factual data) that forced outages or other reductions in electric output by all qualifying facilities on an electric utility's system will occur simultaneously, or during the system peak, or both[.]" Thus, to base a rate for sales on an assumption, it must be supported by factual data. The Court granted Defendants' motions on this Count finding that Plaintiffs proffered no evidence contradicting Dean's testimony that Alabama Power did not assume that all QFs would experience simultaneous outages. Doc. 165 at 26.

Plaintiffs provided evidence that in calculating the charge (contrary to their claims) Alabama Power assumed that all solar customers would experience simultaneous outages 65% of the time. Doc. 149 ¶¶ 40-41. Said another way, as Plaintiffs' expert Rábago described, Alabama Power assumes that roughly two-thirds of all solar generation will fail to operate at the same time. Doc. 145-2 at 32. To use a simple example, if there are ten solar customers who each have a 3 kW solar system, and each experiences a reduction in generation of 2 kW (and thus only

25

produces 1 kW), according to Alabama Power's assumption, all of the solar customers would experience a simultaneous "outage," such that their systems are only generating roughly 35% of their full, 3 kW capacity. *All* of those customers would be experiencing a reduction in generation of 65% at the same time, an assumption for which the regulations require supporting factual data.

It is undisputed that the 35%/65% assumption was not based on factual data, but instead on "informed judgment." Doc. 156 ¶ 40 (disputing that Alabama Power made a 65% assumption about *simultaneous* forced outages but not that it relied on its informed judgment); Doc. 157 ¶ 40 (stating that "[t]he 65% figure represents a diversity factor applied to the fixed costs"). The assumption is not backed by any numerical support in the record. Doc. 145-3 at 5-8. Because Plaintiffs provided evidence that Alabama Power assumed that it must reserve the capacity to provide back-up service equal to 65% of each generator's capacity without factual data to support it, the Court should have denied Defendants' motions on this Count.

III. **<u>The Order's erroneous definitions of back-up power and supplementary power conflict with the federal definitions, the parties' definitions, and Alabama Power's formulation of the back-up power charges.</u>**

When interpreting a regulation or statute, a court cannot add or subtract words from the text of the regulation or statute. *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) ("[W]e are not allowed to add or subtract words from a statute; we cannot rewrite it.") (citations omitted); *see Young*

26

*v. Grand Canyon Univ., Inc.*, 980 F.3d 814, 818 (11th Cir. 2020) ("We construe regulations in much the same way we interpret statutes, so we start with the text— and, if we find it clear, we end there as well.") (internal quotations omitted).

### A. The Court erroneously changed the meaning of the federal definitions.

The Order correctly quotes the regulatory definitions of back-up and supplementary power, Doc. 165 at 19 (quoting 18 C.F.R §¶ 292.101(b)(8)-(9)), then changes the meaning of both by erroneously adding language, *id.* at 21-23, broadening the definition of back-up power while narrowing the definition of supplementary power. The Order's analysis centers around the definition of the term "outage" in back-up power, defining it to include "when a solar unit is functioning but is not producing at its **ordinary full-capacity rate** because it does not have access to its fuel source." *Id.* at 21 (emphasis added). Each of the three reasons provided in support of its interpretation relies on adding definition-altering language.

First, the Order attempts to distinguish between back-up power, which only applies during an outage, and supplementary power, reasoning that "supplementary power does not require any reduction in output" as it "is energy supplied **on top of the facility's full capacity energy output**." *Id.* (emphasis added). The Order continues: "when solar units do not produce at **full capacity** due to cloud cover, the units experience an interruption in supply and reduction of output, which does not fall within supplementary power's definition." *Id.* (emphasis added). But the

27

regulations define supplementary power as "electric energy or capacity supplied by an electric utility, *regularly* used by a qualifying facility *in addition to that which the facility generates itself.*" 18 C.F.R. § 292.101(b)(8) (emphasis added). It is clear from the plain text of the regulatory definition that supplementary power is broader than the Court's revised definition. Nothing in the regulatory definition requires a facility's generation to be at its full capacity or maximum output. For solar facilities, variations in output throughout the day are expected, and can be modeled and predicted. Doc. 149 ¶ 25. As Alabama Power's own data and testimony show, solar facilities do not regularly generate at full capacity. Doc. 145-8 at 22 ("The prevalence of party-cloudy days is expected for Alabama . . . ."); Doc. 145-3 at 4 (stating that the modeled solar data never reached its nameplate capacity of 1 kW); Doc. 145-6 at 64 (agreeing that "the customer source is unlikely to ever produce at its full nameplate capacity").

Solar facilities regularly use supplementary power when operating *below* maximum nameplate capacity, such as at nighttime or during cloud cover. Doc. 149 ¶¶ 28, 74; Doc. 117 ¶ 79 ("Defendants admit that . . . Plaintiffs would be charged for supplementary service when their interconnected, on-site systems do not generate electricity at night."). The correct reading of supplementary power is energy or capacity that is regularly used by a qualifying facility in addition to that which the facility generates, and what a QF generates is almost always less than its full

28

capacity, *as well as* any needed capacity *beyond* its full capacity. The definition is broad enough to include both instances and is not limited to the Court's narrow definition that does not account for the realities of solar generation. The Court's definition of supplementary power is clearly erroneous.

Second, the Court reasons that "back-up power supplied during an 'outage' is 'to replace energy ordinarily generated'" and thus, "when a solar unit does not produce its **ordinary amount of energy output** due to weather patterns or other interruptions, the energy supplied by Alabama Power replaces the amount the solar unit would have generated but for the interruption." Doc. 165 at 21 (emphasis added). The only way for this statement to be consistent with the Court's revised definition of "outage" is to accept that "ordinary" means the "full-capacity rate" or maximum capacity of the solar system. *See id.* (defining outage as "when a solar unit is functioning but is not producing at its ordinary full-capacity rate . . ."). "Ordinary" is defined as "of a kind to be expected in the normal order of events: ROUTINE, USUAL." https://www.merriam-webster.com/dictionary/ordinary (last visited Apr. 20, 2026); *see also* Doc. 162 at 11 n.4 (defining "ordinarily" as "in the ordinary course of events : USUALLY"). As discussed at length in the briefs (and *supra*) and presented in Alabama Power's own evidence, "ordinary" solar generation is variable; it is not ordinary or usual for a solar system to generate at full capacity as it might under perfect operating conditions. Doc. 149 at 27; Doc. 158 at 46; Doc.

29

162 at 11; Doc. 145-8 at 22 ("The prevalence of partly-cloudy days is expected for Alabama . . . ."); Doc. 117 ¶ 79 ("interconnected, on-site systems do not generate electricity at night"). Thus, adding "full-capacity rate" to the text of the definition of outage, and therefore to the definition of back-up power, fundamentally and erroneously alters the regulatory definition.

Third, the Order posits that the back-up power definition is applicable to all kinds of qualifying facilities and facilities experience an outage when they do not have their "fuel source"; thus, "when a solar unit is not exposed to the sun and is not producing all the energy it is capable of producing, it experiences an outage." Doc. 165 at 22. Again, the Order adds language to the text of the definition of outage and back-up power. It incorrectly redefines "ordinarily generate" as the "maximum capacity" of a qualifying facility, which, as argued in the briefs and above, conflicts with the plain meaning of "ordinary." The Order also introduces additional language—"fuel source"—to the definitions and finds that whenever the sun is not shining such that the solar facility is operating at maximum output, the solar system experiences an outage. This addition improperly broadens the definition of back-up power to include any time the sun is not powering solar panels at their maximum capacity. It also conflicts with the parties' definitions, and the formulation of the back-up power charges, as discussed *infra*.

Next, the Court incorrectly states that Plaintiffs assume that an outage "must be a complete termination of all power supply." Doc. 165 at 22. Plaintiffs specifically address partial outages in their reply brief: "Plaintiffs do not argue that back-up power applies only during a 'total' outage." Doc. 162 at 12. They "acknowledge an unscheduled outage could be partial, such as half of a solar customer's panels shutting down while half continue operating . . . ." *Id.* n.5. But reductions in output due to panels malfunctioning are not equivalent to ordinary reductions due to cloud cover or nighttime, which are not "unscheduled outages" and require supplementary power.

The Order also ignores critical textual language in the back-up power definition. As discussed above, the Order ignores or changes the meaning of the word "ordinarily" that modifies generation, which is important for solar facilities because ordinary generation is undisputedly variable and "ordinarily" means normal and routine, *not* maximum or full. Doc. 149 at 10 ¶ 25, 27; Doc. 156 at 6 (failing to dispute Doc. 149 ¶ 25); Doc. 157 ¶ 25 (agreeing that solar generation is variable). Plaintiffs are not requesting an exception for solar facilities and do not have any need to; the regulatory definition—which uses "ordinarily generate"—specifically provides for variable generation like solar.

In addition, the Order's back-up power definition ignores the word "unscheduled" modifying the word "outage." The Order states that "an 'outage'

31

includes when a solar unit is functioning but is not producing at its ordinary full-capacity rate because it does not have access to its fuel source," and similarly says "back-up power includes power supplied or reserved when a solar unit does not function at full capacity because it does not have access to its fuel source." Doc. 165 at 21-23. Both definitions leave out the word "unscheduled," which is problematic for several reasons. First, it broadens back-up power to include all outages, not just "unscheduled" ones. In doing so, it subsumes a separate term, maintenance power, which applies to *scheduled* outages. 18 C.F.R. § 292.101(b)(11). Second, even by Defendants' definitions, a lack of fuel (sunshine) does not necessarily equate to an "unscheduled" outage for solar. Doc. 117 ¶ 79 (stating that Plaintiffs are charged for supplementary power, not back-up power, at nighttime when not generating electricity); Doc 145-8 at 22 (discussing expected variable output and weather variations). The Order also inexplicably ignores the multiple sources cited by Plaintiffs that inform the definition of "unscheduled outage" in the context of electricity regulation and support a finding that an unscheduled outage does not include variations in output due to cloud cover. Doc. 149 at 25-26.

As further support for Plaintiffs' interpretation of "unscheduled outages," APC, with the PSC's approval, employs a definition of unscheduled, or "unplanned," outages that conflicts with its arguments in this case and is consistent with Plaintiffs' position. *See* Ala. Power Co., Docket No. U-5213, 2026 WL 673743 (Ala. P.S.C.

Mar. 3, 2026) (approving the ninth revision of Rate CPE); *see also* Ex. 1, Tariff Sheets for Rate CPE for Alabama Power Company, Revision Ninth (Mar. 4, 2026). Alabama Power's Rate CPE, a rate schedule for QFs with a capacity of more than 100 kW, Ex. 1 at 3, includes a standard contract with a provision for "unplanned outages," *id.* at 17. In the event of an "unplanned outage," the QF must "immediately notify Alabama Power of any event or condition that will result in any portion of the Facility not being able to produce energy." *Id.* This indicates Defendants understand that variable output is not the same as an unplanned outage. Alabama Power could not expect to be notified every time solar generation decreases during the day due to cloud cover, and it would be untenable to expect QFs to notify Alabama Power every time a cloud passes over their system. Thus, Alabama Power is clearly defining "unplanned outages" differently in this context to support the unjustified back-up charge. As the Order points out, "the back-up power definition applies to all qualifying facilities," Doc. 165 at 22; the term should not be defined or interpreted differently to discriminate against some solar facilities.

In sum, the Court's Order changes the federal definitions by erroneously adding and subtracting crucial language to the text. Applying the correct definitions necessitates a finding in Plaintiffs' favor on this Count.

**B. The Court adopted definitions that conflict with the parties' filings and with APC's formulation of the back-up power charges.**

Using the Order's definition of back-up power as including all instances when the system lacks its "fuel source," back-up power would be needed at night and on clear days as the solar system ramps up in the morning (as the sun rises) and ramps down in the afternoon/evening (as the sun sets). But all parties agree that energy or capacity used by solar customers at these times does *not* require back-up power but instead requires supplementary power. Doc. 117 ¶ 79; Doc. 83 at 16-17 (APC's chart showing provision of supplementary power overnight and when the sun is rising and setting); Doc. 149 ¶ 74. Thus, the Order's revised definition conflicts with the interpretations put forward by Defendants—the movants—on the motions the Court granted.

The Court's definitions also conflict with APC's formulation of the back-up charge because it did not consider service provided overnight and as the sun rises and sets to require back-up power. *See* Doc. 83 at 16-17; Doc. 145-6 at 65 (agreeing that solar systems do not produce electricity at night and stating that "I've taken that into consideration in my analysis"). And it is undisputed that Alabama Power modeled what a solar system "ordinarily generates" over a year to determine a solar customer's supplementary power usage. Doc. 149 ¶ 38; Doc. 145-6 at 41 (stating that APC bills solar customers for their net usage under the supplementary service rate), 68 ("They are paying for the supplemental service during times when the

34

generator is not producing."), 70; Doc. 145-5 at 79 (Ex. ND-3). The model's output showed variable output not maximum output which conflicts with the Order's interpretation that supplementary power service is only provided above a facility's maximum output. In addition, any time there is a reduction in solar production due to cloud cover, Alabama Power charges customers for supplementary power at the regular per-kWh rate that all FD customers pay. Doc. 149 ¶ 29; Doc. 145-6 at 41, 68. That practice does not comport with the Order's above maximum output only definition of supplementary power. Thus, according to the Order's definitions, the back-up charge cannot stand because it was formulated based on different definitions. If the Court's definitions are correct, the back-up charge violates the regulations. Because the Order's definitions conflict with the formulation of the back-up charge, the Order could not interpret the definitions as it did and then grant Defendants' motions based on calculations and a methodology that conflicts with the Court's definitions.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court reconsider and vacate its Order granting Defendants' motions for summary judgment and denying Plaintiffs' motion for summary judgment.

Respectfully submitted this 22nd day of April, 2026.

s/Christina A. Tidwell
Christina A. Tidwell (ASB-9696-D10R)
Barry A. Brock (ASB-9137-B61B)
Southern Environmental Law Center
2829 Second Avenue S., Ste. 282
Birmingham, AL 35233
Tel.: (205) 745-3060
Email: ctidwell@selcal.org
       bbrock@selcal.org

*Attorneys for Plaintiffs Mark Johnston,
Teresa K. Thorne and GASP, Inc*

s/M. Clay Ragsdale
M. Clay Ragsdale (ASB-0308-A62R)
Allison L. Riley (ASB-0594-E28M)
Ragsdale LLC
517 Beacon Parkway W.
Birmingham, AL 35209
Tel.: (888) 727-1087
Email: clay@ragsdalellc.com
       allison@ragsdalellc.com

*Attorneys for Plaintiffs James H.
Bankston, Jr. and Ralph B. Pfeiffer, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 22, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

*Attorneys for Defendants Alabama Public Service Commission,*
*Cynthia Lee Almond, Jeremy H. Oden, Chris V. Beeker, III*:
Luther D. Bentley IV
Email: luke.bentley@psc.alabama.gov
V. Chad Mason, Jr.
Email: chad.mason@psc.alabama.gov
ALABAMA PUBLIC SERVICE COMMISSION
100 North Union Street
RSA Union Building, Suite 802
Montgomery, Alabama 36104
Tel.: (334) 242-5200

*Attorneys for Intervenor-Defendant*
*Alabama Power Company:*
David R. Boyd
Email: dboyd@balch.com
Alyssa M. Cook
Email: amcook@balch.com
BALCH & BINGHAM LLP
445 Dexter Ave., Suite 8000
Montgomery Alabama 36104
Tel.: (334) 269-3159
Facsimile: (334) 269-3115

Scott Borden Grover
Email: sgrover@balch.com
Jason B. Tompkins
Email: jtompkins@balch.com
BALCH & BINGHAM LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Tel.: (205) 226-8781
Facsimile: (205) 488-5448

37

s/Christina A. Tidwell
Of Counsel

38